Filed 8/26/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
        Plaintiff and Respondent, )
)       S081700
        v. )
)
WILLIE LEO HARRIS, )
)       Kern County
        Defendant and Appellant. )   Super. Ct. No. SC071427a
_____)

Following a mistrial,[1] a jury convicted defendant Willie Leo Harris of the first degree murder (§§ 187, subd. (a), 189), robbery (§§ 211, 212.5, subd. (a)), and rape (§ 261, subd. (a)(2)) of Alicia Manning; unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)); and arson (§ 451, subd. (d)). The jury found true special circumstance allegations of robbery murder and rape murder (§ 190.2, former subd. (a)(17)(I), (III)), and further found that defendant had used a deadly or dangerous weapon (§ 12022, subd. (b)(1)).[2] The jury returned a verdict of

---

[1] A jury previously convicted defendant of burglary (Pen. Code, §§ 459, 460, subd. (a); undesignated statutory references are to the Penal Code) of Bree Torigiani, but it deadlocked as to all other counts. After defendant waived his right to a jury on enhancement allegations, the trial court found he had suffered a prior felony conviction (§§ 667, subds. (a), (c)-(j), 1170.12, subds. (a)-(e)), and had served a prior prison term (§ 667.5, subd. (b)).

[2] The jury found defendant not guilty of forcible sodomy (§ 286, former subd. (c)) and burglary (§§ 459, 460, subd. (a)) of Manning, and found not true special circumstance allegations of sodomy murder and burglary murder (§ 190.2, former subd. (a)(17) (IV), (VII)).

death.  The trial court denied defendant's automatic application to modify the penalty verdict (§ 190.4, subd. (e)), and sentenced him to death on the murder count and imposed a determinate sentence on the remaining counts and enhancements.

Appeal to this court is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I. FACTS

On May 20, 1997, defendant entered Alicia Manning's apartment and raped and killed her.  He then stole Manning's car and set it on fire.  Defendant told the police he had had consensual sex with Manning on the night of her murder, but denied killing her.  At trial, defendant argued Manning's boyfriend killed her.

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. Alicia Manning

In 1997, Alicia Manning was a college senior living in a Bakersfield apartment with her friend and fellow student, Thea Bucholz.  Manning had been seriously dating her boyfriend, Charles Hill, for a year, and had known him for over three years.  Hill, who was not in school and did not have a job or a working vehicle, lived in Tulare, a town approximately an hour's drive from Bakersfield.  At trial, two unsent letters written by Manning shortly before her death were introduced into evidence:  one was addressed to "Charles sweetheart," and described her love for him; the other was addressed to a friend and discussed her postgraduation plans with Hill.

In April 1997, Bucholz met defendant through a mutual friend.  Defendant and Bucholz became fast friends, and socialized often.  Defendant sought a romantic relationship with Bucholz, which she refused, but they remained friends.

2

Defendant, who was unemployed and did not have a car, lived with his girlfriend, Zenobia Findley, and her brother in an apartment less than a mile away from Bucholz and Manning's apartment.

About a week after Bucholz met defendant, she introduced him to Manning. Manning was in the apartment during three of defendant's visits. Throughout April and May, defendant frequently called the apartment when Bucholz was not home. Manning told Bucholz that defendant's calls were interfering with her studying, and she asked Bucholz to request that he stop calling the apartment.

During this time, Findley suspected defendant had become romantically involved with Bucholz and called the women's apartment. Manning answered the phone and during the ensuing conversation Findley threatened her. Manning reported the call to police.

Around May 16, Manning and Hill discussed ending their relationship because she felt he spent too much time with his friends, and she also feared he might have given her a sexually transmitted disease. Carolyn Krone, an associate director of the student health center at Manning's university, later told Manning that testing indicated that she did not have a sexually transmitted disease.

On May 19, Manning confronted defendant and Bucholz about Findley's threatening phone call and told them she had called the police. Manning was furious and told defendant and Bucholz to tell Findley to stop calling the apartment.

That evening, Manning, Hill, and Hill's father went out to dinner. Hill drove Manning back to her apartment in her car, but did not park in the space closest to her apartment. Manning and Hill had intended to have sex but did not because he was feeling ill. Hill was picked up by his father at Manning's apartment around 10:00 p.m., and Bucholz returned soon thereafter. The women

stayed up talking, and Manning told Bucholz that she had concerns whether Hill was "the right guy for her." No one else visited the apartment that night.

On May 20, around 3:00 p.m., Manning came home from class and Bucholz soon left to go to her class. Defendant telephonically paged Bucholz around 6:15 p.m. When Bucholz called defendant back, he asked if they could meet up later. Bucholz told him to page her around 9:30 p.m., but he never did.

At some point that afternoon, Hill visited the house of a nearby friend, Pat McCarthy, in Tulare. Hill socialized with McCarthy until around 1:00 a.m., and then walked home. Hill spoke with Manning on the telephone around 5:30 p.m. McCarthy could not say if Hill had been at his house the entire time, but he did not remember Hill being gone for more than 20 minutes at any point. According to Hill, 10 to 15 other people came and went from McCarthy's house that day; McCarthy, however, did not recall anyone other than Hill at his house.

Findley ran into defendant near their apartment sometime after 8:30 p.m., gave him some beer she had purchased, and left around 9:20 p.m. to go to a friend's house.

Around 10:00 p.m., James Ave, one of Manning's neighbors who worked as an athletic trainer at her university, noticed her car was parked in the space closest to her apartment, and that the interior dome light was on. Another neighbor, whose apartment shared an exterior staircase and landing with Manning's, heard someone go up and down the staircase about three times, but did not otherwise hear anything unusual. Around 10:10 p.m., this neighbor left his apartment and saw someone leaving Manning's apartment. The neighbor also saw a television and portable stereo in Manning's car.

Around 10:50 p.m., Findley called her apartment; defendant answered and asked her why she had not yet returned. When she arrived at her apartment around

4

11:00 p.m., defendant was there. There was nothing unusual about defendant's demeanor or appearance.

Around 11:00 p.m., firefighters responded to a reported vehicle fire less than a third of a mile away from defendant's apartment. By the time the firefighters arrived at the vehicle, later determined to be Manning's, the fire had been put out. An arson investigator concluded the fire had been intentionally set by using rubbing alcohol as an accelerant. No usable latent fingerprints were found inside the vehicle. A fingerprint obtained from the outside of the vehicle did not match defendant's.

Around midnight, Bakersfield Police Officer Mike Golleher went to Manning's apartment and knocked on the door, but received no answer. Another officer attempted to call the apartment, but the line was busy.

Around 1:30 a.m. on May 21, Bucholz returned to the apartment. She noticed the front door was unlocked and the blinds covering a sliding glass door were open, which was unusual. The television was not in its usual place, and there were items scattered around the living room. Bucholz later determined that the television, a malfunctioning videocassette recorder, and a portable stereo were missing from the apartment.

Bucholz attempted to enter the bedroom, but the door was partially blocked by a fan. Bucholz turned on the light and saw Manning, nude from the waist down, lying facedown on her bed in a pool of blood. Bucholz called out Manning's name, but she did not respond.

Bucholz went to call 9-1-1, but the telephone was not in its usual place in the dining room. She found the telephone with its receiver off the hook on the floor of the dining room, and dialed 9-1-1. Soon thereafter, Officer Golleher entered the apartment and determined that Manning was dead.

5

Defendant paged Bucholz around 4:00 a.m., which was an unusual time for him to page her. She told him it was not a good time to talk, but they spoke later that morning and she told him the police would probably be contacting him because she had given them his name. Defendant became "kind of quiet" after Bucholz said this. Bucholz asked defendant where he had been that night, and he said he was with Findley watching movies and eating pizza. Bucholz thought defendant did not sound like himself.

Around 5:00 a.m., police officers went to Hill's house and told him that Manning had been murdered. Hill started to cry and left the room. The police returned that evening, and saw no visible injuries on Hill's hands, arms, head, or neck.

Crime scene technicians collected physical evidence and took photographs at the women's apartment. There was no evidence of a break-in at any of the apartment's points of entry. There were no usable fingerprints inside the apartment, on the outside doorknob, or on the exterior staircase's hand railing.

Near where the telephone was usually kept was a note that read, "Will called at 6:15 p.m., 9:00 p.m., and at 9:30 p.m." On a microcassette tape located next to the answering machine was a message from defendant to the effect of "If someone calls looking for [Bucholz's] pager's number, don't give it to her, it's my girlfriend, she's trippin'."

On the living room floor was a steak knife partially covered by a bloody T-shirt. The blood pattern indicated the T-shirt had been used to wipe the knife's blade. The blood on the knife and T-shirt was consistent with Manning's. Blood on a hand towel found in the living room was also consistent with Manning's.

Near Manning's body was a pair of shorts, which tested negative for blood and semen. Also in the bedroom was a pair of white panties. There was a bloody sanitary napkin inside the panties, and there was blood on the edge of the panties.

6

The panties and napkin tested negative for semen. Neither the panties nor the shorts were torn.

Underneath the shorts were a bloodstained note pad, two broken bottlenecks, and a shard of glass. Several other shards of glass were found near Manning's head and under her body. A large drinking glass missing its base was found in a pile of clothes near Manning, and the broken base was also found near her. Blood consistent with Manning's was on some of the shards. Also on the bedroom floor was a bloody knife with a two-pronged tip and a bent serrated blade.

Blood had pooled around Manning's head, and there was spattered blood on the walls. There were also blood smears on Manning's buttocks, one of her thighs, and her feet.

Manning's body lay on a blanket, and a semen stain was found on it near her vagina. Semen was also located on the side of a comforter facing away from Manning's body.

Oral, vaginal, and anal swabs were collected from Manning's body. A sample of urine that had pooled between Manning's legs was also collected. The vaginal swabs and urine sample tested positive for the presence of semen. The anal swabs also tested positive for semen but contained relatively few sperm, and it was possible that semen had drained from Manning's vagina into her anus.

Head and pubic hair samples were also collected from Manning's body, but all recovered hairs were consistent with her own. Her nails were scraped, but the scrapings were not analyzed. Manning's left fist contained head hair that was consistent with her own and inconsistent with defendant's, but it was not further analyzed.

On May 22, police officers contacted defendant at his apartment. Defendant told them he was at his apartment on the night of Manning's murder.

7

Defendant said he was last in the women's apartment with Bucholz on the morning of the day before Manning's murder, and specifically denied being in their apartment on the night of the murder. He admitted he had called the apartment several times that night. Defendant voluntarily removed his shirt, revealing no visible injuries.

On May 30, Detective Richard Herman of the Bakersfield Police Department drove defendant to a laboratory so his blood could be drawn for DNA analysis. Defendant repeatedly asked Detective Herman about the physical evidence found at the crime scene, and specifically asked if the police had found blood belonging to the suspect. Defendant became extremely nervous when Detective Herman informed him that DNA evidence had been collected from the crime scene. On the drive home, Detective Herman asked defendant if he had ever had sex with Manning. Defendant hesitated, and then said they had had sex twice: once in April in Manning's bedroom, and again in the living room the night before she was murdered. Defendant stated both encounters were consensual. Detective Herman asked defendant why he had previously denied having a relationship with Manning, and he said he did not "want to be involved."

On June 11, detectives interviewed defendant. After being advised of and waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, defendant told the detectives he had had sex with Manning only on the night before she was murdered. Defendant said he had worn a condom, but took it off before ejaculating. He initially denied having sex with Manning in April, but then said he had. When asked whether the semen collected from Manning would match his DNA, defendant said he thought it would.

A detective told defendant the DNA analysis would be able to determine when the semen had been deposited. Defendant then said Manning invited him to come to her apartment on the night she was murdered. Defendant said he waited

8

for Findley to come home from work, left his apartment after she left, and then went to Manning's apartment. Defendant said he had sex with Manning in her bedroom. Defendant said he had worn a condom, took it off before ejaculating, and then flushed it down the toilet. Defendant said the sex was consensual, and denied killing Manning. When asked why his story kept changing, defendant said, "I'm conniving just like you're conniving, but I didn't kill the bitch."

Around July 1, police investigators spoke to defendant's friend, Anthony Denweed, and Denweed's girlfriend, Arlene Holiday. Holiday told the police that defendant tried to sell Denweed a television after Manning's murder, but at trial she testified she told the investigator that defendant attempted to sell the television before the murder. Denweed denied that defendant had ever tried to sell him a television, and denied telling Holiday about such a sale.

In 1999, a police investigator spoke to an acquaintance of defendant's, Debra Cain, who, at the time of Manning's murder, lived across the street from defendant. Cain told the investigator that defendant tried to sell her a malfunctioning videocassette recorder in May or June of 1997, but at trial she testified the attempted sale occurred before Manning's murder.

The urine sample, the vaginal and anal swabs, portions of the comforter, and fibers from the blanket were sent to Cellmark Diagnostics to be compared with blood samples obtained from defendant, Manning, Hill, and two of Hill's friends. A deputy laboratory director of Cellmark testified about the results of the DNA testing performed. Based on the results of a polymerase chain reaction process, defendant was the only person who could not be excluded as the source of the sperm on the vaginal swabs. The sperm sample was consistent with defendant's DNA to a statistical frequency of 1 in 410 million in the African-

9

American population, 1 in 1.6 billion in the Caucasian population, and 1 in 1.5 billion in the Hispanic population.[3] The presence of sperm on the vaginal swabs indicated semen had been deposited no more than 48 hours before collection. Defendant was also the only one of the five tested who could not be excluded as the source of the sperm on the blanket. The sample was consistent with defendant's DNA to a statistical frequency of 1 in 1.6 million in the African-American population, 1 in 4.8 million in the Caucasian population, and 1 in 9.1 million in the Hispanic population. And defendant was also the only one who could not be excluded as the source of the sperm in the urine sample. The sample was consistent with defendant's DNA to a statistical frequency of 1 in 1,100 in the African-American population, 1 in 11,000 in the Caucasian population, and 1 in 13,000 in the Hispanic population.

Hill and his two friends were excluded as sources of the sperm on the anal swabs, but the amount of sperm was so low that defendant could neither be excluded nor included as the source. Hill was the only one who could not be excluded as the source of the sperm found on the comforter.

An autopsy revealed that Manning had died due to extreme blood loss that occurred in a matter of minutes. She had suffered blunt force trauma to four distinct areas along the left side of her head. The presence of glass shards under her scalp indicated these injuries were caused by a heavy glass object. These injuries could have rendered her unconscious or killed her.

Manning also had been stabbed at least 57 times in the neck, and there were additional stab or slice wounds on her right cheek, left arm, and the left side of her abdomen. There were also a few scrape marks on her left elbow and the left side

---

[3] Defendant is African-American. Manning was Caucasian.

10

of her chest and abdomen, and some cuts on her left hand were consistent with being defensive wounds. Some of the stab wounds on Manning's neck appeared to have been caused by a knife consistent with the two-pronged knife found in her bedroom. Manning was likely alive but not necessarily conscious when the blunt force trauma and stab wounds were inflicted to her head and neck. The stabbings were consistent with a "rage killing," that is, a passionate murder, which more often than not involves people who "know each other."

Manning did not suffer any vaginal trauma, which is not uncommon even when a sexual assault has occurred. She did suffer anal trauma consisting of three small contusions or bruises inflicted around the time of her death. These bruises were consistent with anal penetration by an object the size of an adult penis, and would have not been present unless there was such penetration.

### b. Bree Torigiani

Bree Torigiani and her brother lived in a condominium in Bakersfield. Around 1:00 a.m. on June 11, 1997, Torigiani arrived home and noticed the kitchen window was open and the screen had been removed. Her videocassette recorder was missing, and the contents of a tin container were spread out over the living room floor. Torigiani heard someone inside the residence. She called out her brother's name, and defendant ran down the hallway and out the front door carrying a suitcase that had been under Torigiani's bed.

Torigiani called 9-1-1 and reported the burglary, and a police officer spotted defendant, still carrying Torigiani's suitcase, near defendant's apartment. Defendant dropped the suitcase and attempted to run away, but was apprehended. The officer searched defendant, and found several pieces of jewelry and a "Walkman-type radio," all of which belonged to Torigiani. The suitcase contained Torigiani's videocassette recorder and her camera.

11

## 2. *Defense Evidence*

Teodula Ruiz lived in the same apartment complex as Manning. In the hours after Manning's murder, the police asked Ruiz if she had seen anyone driving Manning's car, and she said she had not. Later that day, Ruiz recalled having seen a Caucasian man park Manning's car in the space closest to Manning's apartment around 5:00 or 6:00 p.m. on the day of Manning's murder. Ruiz saw no one else in the car. A few days later, a detective showed Ruiz a photographic lineup from which she identified Manning's boyfriend Hill as the driver. Ruiz told the detective she was unsure if she saw the car on the night of Manning's murder or on the night prior, but leaned towards the night of the murder. At trial, Ruiz testified she saw Manning's car on the night of the murder.

Lori Hiler also lived in Manning's apartment complex. Around 10:00 p.m. on the night of the murder in front of Manning's apartment, Hiler saw someone who looked like Hill carrying a television set. Hiler also saw that the door to Manning's car was slightly open and the dome light was on. A detective showed Hiler a photographic lineup from which she identified Hill as the person whom she had seen carrying the television set. Hiler later told the detective, however, she was not really sure Hill was the person she had seen, or if she just picked him because his picture had been in the newspaper. At trial, Hiler testified she was not sure who she saw.

Also on the night of Manning's murder, Christopher Bourgoine heard a "poof" noise, looked around, and saw Manning's car on fire. Bourgoine grabbed his fire extinguisher and put out the fire. Bourgoine testified that a man, who did not match defendant's description, repeatedly asked him if he saw who set the fire. The man disappeared some time after the fire investigator had arrived. Bourgoine's sister, who lived with him, also remembered this man.

12

Marvin Ament, a pediatric gastroenterologist, reviewed microscopic slides taken during Manning's autopsy, the forensic pathologist's testimony, and a portion of the transcript of defendant's first trial. Dr. Ament did not see any anal injuries on the slides he examined, and he believed Manning had not been sodomized.

William Stanley, an obstetrician/gynecologist and infertility specialist who had performed 10 to 12 rape examinations about 10 years before the trial, reviewed the autopsy report, crime scene photographs, a portion of the transcript of defendant's first trial, and a medical report. Dr. Stanley saw no evidence indicating Manning had nonconsensual sex. Dr. Stanley testified that medical studies indicated vaginal injuries occurred in 30 to 98 percent of rape cases, but he conceded that in some rape cases there were no injuries. On cross-examination, Dr. Stanley testified that medical studies indicated 80 percent of sexual assault victims suffer bodily injuries, such as bruises, scratches, scrapes, cut or stab wounds, or injuries caused by being bludgeoned.

### 3. Rebuttal Evidence

A detective testified he twice spoke on the telephone with Hill's friend, McCarthy, who confirmed Hill was with him on the night of Manning's murder. The detective told McCarthy he could get in trouble for supplying Hill with a false alibi, and McCarthy responded, "I don't have to worry about that because [Hill] was here and did not leave and could not have been in Bakersfield on [the night of Manning's murder]."

### B. Penalty Phase

#### 1. Prosecution Evidence

##### a. Victim impact evidence

Manning's father testified about her aspirations, their family life, and how her death affected them. Manning was a loving, loyal, caring person who went out of her way to help others without expecting anything in return. She was close to her two younger brothers, and her absence caused a "tremendous void" in the family. Her death caused her mother to have nightmares and filled her father with anger.

##### b. Prior convictions

Defendant had been convicted of burglary in 1990 and possession of cocaine in 1988 and 1995.

##### c. Prior uncharged offense

On February 4, 1997, Beatrice Thompson was leaving a store when defendant approached her and demanded her purse. Thompson refused, so defendant snatched the purse with so much force its strap broke.

#### 2. Defense Evidence

Defendant was born January 9, 1969, the youngest of six children. Shortly after he was born, his father, a "hustler" and pimp, was killed by a woman with whom he was having an affair. Defendant's mother, Jerlene Harris, stayed home to take care of her children, but eventually went back to work and got off welfare.

Defendant lived with his family until he moved in with his girlfriend Findley, but moved back home whenever he and Findley fought, which was often. Defendant had many girlfriends and argued with all of them, but was never physically violent toward any of them. Various family members and friends also testified about defendant's nonviolent nature.

14

Defendant's sister, Delora Harris, helped raise him. She recalled that she once went to check on him, and discovered the babysitter beating him. Defendant often came home from the babysitter very hungry even though Jerlene had prepared food for him. When Delora attended junior college in another city, defendant begged her not to go. Delora regularly returned to Bakersfield, and took him back with her to school.

Defendant's siblings first introduced him to marijuana when he was five years old. A family member introduced defendant to crack cocaine when he was 16 or 17 years old.

Defendant was also close to Delora's daughter, Dracena Smith. Smith recalled as a child jumping off the top bunk of bunk beds and cutting her head open. Defendant attempted to help her, but fainted at the sight of her blood. Smith dated one of defendant's friends, who had introduced her to crack cocaine. When defendant found out, he counseled Smith on the dangers of using crack cocaine, so she stopped. Smith testified defendant always wanted to be loved, and if the woman he was dating was not available, he would seek attention from other women.

Defendant dated Avonda Jones in 1995, and they had a son together. Defendant remained close to his son after he and Jones broke up. Jones considered defendant to be a good person and a good father.

Cecil Whiting, a clinical psychologist, examined defendant and interviewed his family members. As a child, defendant had been diagnosed with attention deficit hyperactivity disorder, and he continued to have some characteristics of the disorder as an adult. According to Dr. Whiting, defendant did not have any significant problems with general cognition, thinking, or applying good judgment, nor with his emotional state, verbal abilities, or short-term memory. Dr. Whiting found that defendant's long-term memory, ability to concentrate, and ability to

15

hear and understand others were mildly impaired, and that he had some minor learning disabilities. Defendant had a fear of the dark and of blood. Dr. Whiting believed defendant's talkative and friendly nature was a form of compensation for the psychological pain of his past and that his being raised by his mother and siblings led to his tendency to form relationships with dominating women. Dr. Whiting testified that in stressful situations defendant might use harsh language. In Dr. Whiting's opinion, defendant's personality and psychological characteristics were inconsistent with others convicted of similar crimes.

James Park, an administrator for the former California Department of Corrections, testified as an expert in prison classifications and operations. According to Park, when defendant previously was in prison, he had only a few discipline problems, and was neither a model prisoner nor a problem prisoner. Defendant had an above-average work record and attended Narcotics Anonymous. Defendant had some minor rules infractions, but was not physically violent. Park believed defendant would adequately adjust to prison life.

## II. DISCUSSION

### A. Pretrial Claims

#### 1. Change of Venue

Before jury selection, defendant twice moved unsuccessfully for a change of venue, and he unsuccessfully renewed this motion after the jury had been selected. Defendant contends the trial court prejudicially erred by denying the motions.[4] We disagree.

---

[4]     We note that in this claim and most others on appeal, defendant contends that the asserted error or misconduct he raises infringed his state and federal constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17, applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed

*(footnote continued on next page)*

16

A defendant's motion for change of venue must be granted when "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county" where the charges were filed. (§ 1033, subd. (a).) "Reasonable likelihood" in this context means " 'means something less than "more probable than not," ' and 'something more than merely "possible." ' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) In ruling on the motion, in which the defendant bears the burden of proof, the trial court considers the " ' "(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." [Citations.]' " (*People v. Famalaro* (2011) 52 Cal.4th 1, 21 (*Famalaro*); see *Proctor*, *supra*, 4 Cal.4th at p. 523.)

On appeal, the defendant must show both error and prejudice, that is, " 'at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and that it was reasonably likely that a fair trial was not had. [Citations.]' [Citation]. Although we will sustain the trial court's determination

---

*(footnote continued from previous page)*

explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

of the relevant facts if supported by substantial evidence, ' "[w]e independently review the court's ultimate determination of the reasonable likelihood of an unfair trial." ' [Citation.]" (*Famalaro*, *supra*, 52 Cal.4th at p. 21.)

In his first motion, defendant contended prejudicial publicity had saturated Kern County and prevented him from receiving a fair trial. Defendant argued the extensive media coverage portrayed him in sensational and negative terms, and Manning in a sympathetic light. He also argued that because a majority of the Kern County residents lived in the greater Bakersfield area, most of them had been exposed to the media coverage. Defendant also claimed state legislators "halt[ed] the government" to remember Manning, which implied his case had political overtones.

At the hearing on his first motion, defendant presented testimony by Edward J. Bronson, a California State University, Chico, professor who testified as an expert in change of venue. He reviewed the local newspaper's and television stations' coverage. Dr. Bronson also surveyed county residents about their knowledge and opinions of defendant's case. Based on this data, Dr. Bronson concluded there was a reasonable likelihood the pretrial publicity detrimentally influenced prospective jurors' views of the case.

Dr. Bronson reviewed the media coverage of defendant's case. From the date of Manning's murder in May 1997 to mid-April 1999, the only local newspaper, The Bakersfield Californian, published 48 articles about the case. Forty-three of those articles were published before or during defendant's first trial, which ended in a mistrial in December 1998. Local television stations aired 294 reports about Manning's murder, most during defendant's first trial.

Dr. Bronson believed the newspaper coverage of the crime was inflammatory and likely to prejudice the community from which the venire would be drawn, citing the articles' use of language such as "[b]rutal, grisly, ghastly,

18

viciousness, stuff of nightmares, horribly, shocked, traumatized, anger, terrible tragedy, [and] mystery." Dr. Bronson also testified about the "salience" of the case, that is, the extent to which the case had "grab[bed]" the community. In Dr. Bronson's opinion, the case "caught the community's attention" due to the "viciousness" of the crime and Manning's "apparent innocence." Dr. Bronson testified the newspaper articles highlighted that defendant was African-American and Manning was Caucasian, which was a "particularly dangerous" form of pretrial "publicity" in a case in which the defendant claimed the victim consented to the sexual acts.

Dr. Bronson also testified about the extensive coverage of defendant's first trial having ended in a mistrial after the jury deadlocked 11 to 1, a fact that would be inadmissible at his second trial. Dr. Bronson believed the news coverage implied that the holdout juror — who was the only African-American juror — was rigid, irrational, and irresponsible. According to Dr. Bronson, the newspaper articles repeatedly quoted police sources expressing confidence that defendant "was the right guy" and stating that he had declined three requests to be interviewed, all of which created the appearance that he was guilty.

Dr. Bronson also designed a telephone public opinion survey that was administered to 400 Kern County residents in February 1999. Seventy-two percent of the survey participants knew of the case. Of those who recognized the case, 55 percent said defendant was definitely or probably guilty of murder, and 45 percent said he should receive the death penalty. Of those who recognized the case, 81 percent knew defendant's and Manning's races, 70 percent knew he was accused of raping and sodomizing her and that he claimed the sex was consensual, 64 percent knew he claimed that Hill killed Manning, 47 percent knew defendant's first trial ended with the jury deadlocked 11 to 1, and 22 percent knew defendant had a criminal record. Dr. Bronson testified that the more a survey

19

participant knew about the case, the more likely he or she believed defendant was guilty.

Acknowledging that the case was "as serious as a case can get" because defendant was facing the death penalty, and that the "substantial" media coverage referred to the brutal nature of the crime and its "sexual overlay," the trial court nevertheless denied the motion to change venue. It noted the media had prominently covered defendant's claim that Hill killed Manning, and also had reported that a similar crime had been committed while defendant was in custody. The court noted that, in addition to presenting an alternative to the prosecutor's theory of the case, the newspaper interviewed the holdout juror from defendant's first trial, who explained he had not been convinced of the prosecutor's case beyond a reasonable doubt; the court implicitly rejected defendant's contention that the coverage depicted this juror's vote as irrational. In the court's view, the media coverage was "pretty evenhanded" overall.

The trial court declined to find the telephonic survey compelling, given its failure to adequately canvass some of the outlying towns from which the venire would be drawn. Moreover, the court noted the survey participants' level of prejudgment was "not a tremendous increase" over the figure of "between 28 and 40 percent" of people who believe that any criminal defendant is "probably guilty."

With respect to the community status of defendant and Manning, the trial court observed defendant was a lifelong resident of the county, while Manning had come from another state to attend college and intended to leave after graduation. The court acknowledged that the media coverage portrayed Manning in a very sympathetic light, but found defendant had not been "demonized." The court found that in 1997 the California Assembly had adjourned in honor of Manning's memory, but there were was no significant political overtones in the act.

20

The trial court concluded defendant had failed to show a reasonable likelihood that he would be unable to receive a fair trial in Kern County.

On May 25, 1999, defendant renewed his motion for change of venue. The sole contention supporting the renewed motion concerned an article published in that day's edition of The Bakersfield Californian reporting that another inmate claimed defendant had "all but confessed" to killing Manning. In denying the second motion, the trial court found the information in the article was not significantly different from that in past articles, and also noted the article reported that defendant denied making such an admission.

On June 18, 1999, at the conclusion of voir dire before the swearing in of the jury, defendant again renewed his motion, arguing that the juror questionnaires indicated a large percentage of the venire had heard of the case. The trial court denied the third motion.

Although defendant moved for change of venue three times, the last two motions did not significantly alter the information presented to the trial court with the first motion. Therefore, our analysis of the court's rulings is the same for all three motions.

Regarding the first factor in the legal analysis — the nature and gravity of the crimes — the trial court acknowledged the seriousness of the charged offenses. Even in a capital case, however, this factor standing alone does not compel change of venue. (See *Famalaro*, *supra*, 52 Cal.4th at pp. 21-22; *People v. Ramirez* (2006) 39 Cal.4th 398, 434 (*Ramirez*).) Defendant acknowledges the court discussed the *gravity* of the crimes, but contends it failed to evaluate the *nature* of the crimes. Not so. The court explicitly recognized the case involved both murder and rape charges. To the extent defendant contends the court failed to account for the cross-racial nature of the crimes, the record contradicts that claim. Moreover, we have said in another case that "[a]lthough some prejudice may have arisen

21

from the racial difference between defendant and . . . the victims, 'this element of possible prejudice presumably would follow the case to any other venue . . . .' [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 448 (*Lewis*).)  In any event, "the sensationalism inherent in all capital murder cases will not in and of itself necessitate a change of venue." (*People v. Adcox* (1988) 47 Cal.3d 207, 231.)

As to the second factor — the nature and extent of the media coverage — the trial court found the local news coverage to be "substantial."  Heavy media coverage may weigh in favor of a change of venue, but does not necessarily compel it.  (*Ramirez*, *supra*, 39 Cal.4th at p. 434 [affirming denial of change of venue in a serial murder case when the trial court described the media coverage as " 'saturation' "].)  " 'When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base [the] evaluation on [the judge's] "own perception of the depth and extent of news stories that might influence a juror." ' [Citation.]" (*Famalaro*, *supra*, 52 Cal.4th at p. 24.)  We do not doubt the court's finding that there was substantial pretrial publicity, given that 72 percent of the participants in defendant's telephonic survey recognized his case.  Moreover, of those who recognized the case, 55 percent said defendant was definitely or probably guilty of murder and 45 percent said he should receive the death penalty.  But we have upheld a trial court's denial of venue change motions in cases involving greater or comparable recognition and prejudice, as measured by such surveys.  (See *id.* at p. 19 [83 percent surveyed had heard of the case, and of those, 70 percent said the defendant was definitely or probably guilty of murder, and 72 percent said he should receive the death penalty]; *People v. Rountree* (2013) 56 Cal.4th 823, 836 (*Rountree*) [81 percent surveyed recognized the case, and of those, 46 percent said the defendant was definitely or probably guilty]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1396

22

[85 percent surveyed had heard of the case, and of those, 58 percent believed the defendant was probably or definitely guilty]; *Ramirez*, *supra*, 39 Cal.4th at p. 433 [94 percent surveyed had heard of the case, and of those, 52 percent believed the defendant was responsible for the charged crimes]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 45 [71 percent surveyed recognized the defendants' case, and of those, over 80 percent said the defendants were definitely or probably guilty].)

Defendant contends the publicity was "unbalanced in the extreme," and that the record does not support the trial court's finding that it was "pretty evenhanded." He complains that the coverage did not merely report on the facts of the case, but also employed inflammatory or inaccurate language, contained material inadmissible in court, and created a presumption of guilt. The bulk of the coverage, however, was framed in neutral terms, contained little inadmissible or prejudicial material, reported defendant's theory that he did not kill Manning, and was not otherwise an attempt to convict him in the media. (See *Famalaro*, *supra*, 52 Cal.4th at pp. 22-23; *People v. Prince* (2007) 40 Cal.4th 1179, 1218-1219 (*Prince*).) Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case. (*People v. Panah* (2005) 35 Cal.4th 395, 448 (*Panah*).)

We acknowledge that continuous and extensive factual accounts may be potentially prejudicial. (See *Williams v. Superior Court* (1983) 34 Cal.3d 584, 590.) In *Williams*, petitioner and his brother were charged with the murder, rape, burglary, kidnapping, kidnapping for robbery, and robbery of a young Caucasian woman. (*Id.* at p. 587.) The petitioner's brother was tried first, convicted on all counts, and sentenced to death. (*Ibid.*) The newspaper coverage during the petitioner's proceedings, while accurate, was capable of eliciting a hostile response from the reader. We cited a newspaper article that quoted the prosecutor during the brother's trial as having said " ' "[the] defendant took upon himself to

23

take Heather Mead's virginity, her property and her life to satisfy his own lust and greed." ' " (*Id.* at p. 591.) In addition, a newspaper article about the brother's trial quoted the criminalist's testimony that hairs found at the crime scene had " 'Negroid features,' " and noted the petitioner and his brother were African-American. (*Ibid.*) We held that such factual recitations in Placer County, in which only 402 of a population of 117,000 people were African-American, "could have a potentially devastating impact." (*Ibid.*) Unlike defendant's case, which involved coverage of the first trial's ending after six weeks in a hung jury and mistrial on the capital charges, in *Williams* the media coverage described the petitioner's brother's yearlong trial, which had resulted in a conviction and death verdict.[5] (*Ibid.*) The publicity in *Williams* was "extensive," "continual," "repetitive," "at times inflammatory," lasted over a period of two years, and described the evidence that was presented at the brother's trial and would likely be introduced at the petitioner's trial. (*Id.* at pp. 589-592.) The connection between the brothers' cases had become so strong there was a danger that potential jurors would transfer the brother's guilty verdict onto the petitioner. (*Id.* at p. 595.) In comparison, defendant was tried in a larger county that was less saturated by the media coverage, and was tried alone.

Most of the publicity about which defendant complains was disseminated between the time of Manning's murder in May 1997 and his first trial, which ended in December 1998; defendant was not retried until June 1999. Dr. Bronson testified that people tend to remember information that was first received, which, in his opinion in this case, created the presumption that defendant was guilty. We

---

[5] We reversed the brother's conviction and death penalty due to the trial court's erroneous denial of his motion for change of venue. (*People v. Williams* (1989) 48 Cal.3d 1112.)

24

have held, however, "[t]he passage of time ordinarily blunts the prejudicial impact of widespread publicity. [Citations.]" (*Prince*, *supra*, 40 Cal.4th at p. 1214; see *Panah*, *supra*, 35 Cal.4th at p. 448.) Dr. Bronson acknowledged that newspaper coverage was heaviest immediately after Manning's murder and diminished over time, but noted that the opposite was true for television coverage because so many stories were aired during defendant's first trial. In addition, as defendant argued in his second and third motions for change of venue, the coverage of his case continued until the start of the his second trial, and many prospective jurors were aware of his case. Based on this, defendant contends the extensive television coverage of his first trial not only reignited the public's interest in his case, but also provided potential jurors with arguably prejudicial information, such as his first trial's having ended in an 11-to-1 hung jury in favor of guilt. But, as the trial court noted, during defendant's first trial there was "substantial coverage" of his theory that Hill killed Manning, and in a published interview the holdout juror from the first trial explained he felt the prosecution had not proved its case beyond a reasonable doubt. Even if media coverage kept defendant's case in the public eye until the start of his second trial, defendant fails to demonstrate that it was so extensive and slanted against him as to prevent him from receiving a fair and impartial trial.

With respect to the third factor — the size of the community — this factor did not support a change of venue. In 1999, Kern County had a population of 648,400, ranking it 14th out of California's 58 counties in population size. We do not find persuasive defendant's reliance on *Steffen v. Municipal Court* (1978) 80 Cal.App.3d 623, in which the Court of Appeal granted a petition for writ of mandate directing the trial court to grant the petitioners' motion for change of venue filed in San Mateo County, which at the time had a population of 575,000. In that case, the petitioners had been charged with misdemeanor solicitation of an

25

act of prostitution at the theater where they worked.  (*Id.* at p. 625.)  In granting the petition, the Court of Appeal based its decision on the long-term negative publicity that caused the theater to develop a reputation as a place frequented by prostitutes; the size of the county did not figure in its analysis.  (*Id.* at pp. 626-627.)  Conversely, the Attorney General cites several capital cases in which motions for change of venue were denied in smaller counties.  (See, e.g., *People v. Vieira* (2005) 35 Cal.4th 264, 280-283 [Stanislaus County, population 370,000]; *People v. Weaver* (2001) 26 Cal.4th 876, 905 (*Weaver*) [Kern County, population exceeding 450,000]; *People v. Hayes* (1999) 21 Cal.4th 1211, 1250-1251 [Santa Cruz County, population under 200,000]; see also *Rountree*, *supra*, 56 Cal.4th at p. 839 [Kern County, population of 543,477].)

*Weaver* is particularly instructive.  There, we affirmed the denial of a change of venue from Kern County when it was less populous than during defendant's trial.  We described the county's "moderate size" to be a "relatively neutral" factor, noting the key consideration was whether the size of the population diluted the effect of adverse publicity.  (*Weaver*, *supra*, 26 Cal.4th at p. 905; see *Rountree*, *supra*, 56 Cal.4th at p. 839.)  As we have explained, the media coverage in this case was not so extensive and negative as to require us to presume prejudice (see *Lewis*, *supra*, 43 Cal.4th at p. 450), and the size of the county supported the conclusion that an unbiased jury could likely be found.

The fourth factor — community status of the defendant, meaning whether the defendant was known to the public before the crime — did not weigh heavily either for or against a change of venue.  (*Ramirez*, *supra*, 39 Cal.4th at p. 434; see *Famalaro*, *supra*, 52 Cal.4th at p. 23.)  Although defendant was a lifelong resident of the community, there was no evidence that he or his family were known to the public before his arrest.

26

We are mindful that defendant was an African-American in a predominately Caucasian community and that, after the murder had been committed, his criminal record was published. (See *Famalaro*, *supra*, 52 Cal.4th at p. 23; *People v. Williams*, *supra*, 48 Cal.3d at p. 1129 ["[T]he social, racial and sexual overtones [of the case] were precisely the kind which could 'most effectively prejudice' defendant."].) Although defendant's photograph was published several times in the newspaper, and one article did refer to his race, the coverage did not emphasize his race or refer to him in a racially inflammatory manner. (See *Prince*, *supra*, 40 Cal.4th at p. 1214.)

Moreover, any possible racial prejudice presumably would follow the case to any other venue. (See *Prince*, *supra*, 40 Cal.4th at p. 1214.) Defendant contends such reasoning eliminates possible racial prejudice as a factor when determining whether to change venue. Other than Dr. Bronson's concerns about the racial overtones of the case, however, there is no evidence in the record that race relations in Kern County were significantly different from those in other counties.

Finally, the fifth factor — prominence of the victim, meaning whether the victim was known to the public before the crime — did not support a change of venue. (*Ramirez*, *supra*, 39 Cal.4th at p. 434; see *Famalaro*, *supra*, 52 Cal.4th at pp. 23-24.) Manning was not known to the public before her murder, and she did not have long or extensive ties to the community. Rather, she came from another state to Bakersfield to attend college there, and she intended to move away after her anticipated impending graduation. Manning came to the public's attention only because she was a murder victim.

Nonetheless, as the trial court noted, the California State Assembly had adjourned in honor of Manning's memory. A newspaper article also reported that, due to her father's military service, Manning qualified to be buried in Arlington

27

National Cemetery and was interred there. Even were we to assume this evidence implied Manning or her family occupied positions of prominence, nothing in the record suggests these factors influenced the jury pool. (See *Panah*, *supra*, 35 Cal.4th at p. 449; cf. *People v. Williams*, *supra*, 48 Cal.3d at pp. 1126-1131 [substantial number of prospective jurors knew the victim, her family, potential witnesses, or someone associated with the prosecution].)

Defendant contends the local newspaper's extensive coverage of Manning's murder humanized her and made her seem part of everybody's family. But as we have said in other cases, any features of the case that gave the victim prominence in the wake of the crimes would inevitably have become apparent no matter in which venue defendant was tried. (See, e.g., *Prince*, *supra*, 40 Cal.4th at p. 1214.)

In addition, defendant contends the trial court improperly prevented Dr. Bronson from opining whether pretrial publicity had so affected public attitudes toward the case that defendant would be unable to avail himself of the presumption of innocence that the law guarantees him. In response to defense counsel's inquiry regarding the impact of the pretrial publicity on the venire, Dr. Bronson stated, "[T]here is a reasonable likelihood that the defendant could not have a jury panel that was unaffected by the pretrial publicity and could afford him the presumption of innocence to which he's entitled." The prosecutor objected to the answer on the ground it gave a legal conclusion. The trial court sustained the objection as to the latter portion of Dr. Bronson's answer and struck the phrase "and could afford him the presumption of innocence to which he's entitled." Defense counsel later asked Dr. Bronson if he had an opinion whether defendant "would be able to begin his trial here in Kern County with the burden of proof properly in place?" The trial court sustained the prosecutor's objection that the question called for a legal conclusion.

Defendant is correct that, in determining whether there is a reasonable likelihood that a defendant can receive a fair and impartial trial in the venue, the trial court may rely on evidence such as "qualified public opinion surveys or *opinion testimony offered by individuals*, or on the court's own evaluation of the nature, frequency, and timing of the material involved." (*Maine v. Superior Court* (1968) 68 Cal.2d 375, 383, italics added.) We primarily rely, however, on the trial court's judgment for these matters (*Famalaro*, *supra*, 52 Cal.4th at p. 24), especially when determining the ultimate issue of the venue's fairness and impartiality. (See *ante*, at p. 21.) Even assuming the trial court erred in excluding Dr. Bronson's proffered testimony, based on our consideration of the evidence in total (including Dr. Bronson's testimony), we agree with the trial court's conclusion that defendant failed to demonstrate there was a reasonable likelihood that he could not receive a fair and impartial trial in the venue. (See *Famalaro*, *supra*, 52 Cal.4th at p. 24.)

Defendant also fails to demonstrate a reasonable likelihood that he was prejudiced, that is, that he did not *in fact* receive a fair and impartial trial. (See *Proctor*, *supra*, 4 Cal.4th at p. 523.) With respect to this second part of the showing, we examine the voir dire of the jurors to determine whether the pretrial publicity had a prejudicial effect on the jury. (*Id.* at p. 524.) Among the 12 seated jurors at defendant's trial, two knew nothing about his case and the remaining 10 recognized the case but remembered few specifics. That most of the seated jurors had some prior knowledge of the case does not compel a change of venue. (See *Famalaro*, *supra*, 52 Cal.4th at p. 31 [" 'The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.' [Citation.]"]; *Rountree*, *supra*, 56 Cal.4th at p. 840 [eight of the 12 jurors had heard something about the case].) On appeal, defendant does not challenge any of

29

the responses of the seated jurors, all of whom testified under oath they could put aside outside influences and fairly try the case. To the extent defendant contends we cannot believe jurors who are aware of the case but claim not to have prejudged it, we have previously rejected this argument (*Prince*, *supra*, 40 Cal.4th at p. 1215), and do so again here. Although such assertions do not automatically establish jurors' impartiality, our independent review of the record discloses no evidence that any of the seated jurors harbored a bias that was not detected during voir dire. Moreover, as the Attorney General notes, the jury did not convict defendant of sodomy and burglary, which tends to show that it was not prejudiced against him, but rather was able to fairly evaluate the evidence before it.

Accordingly, the trial court properly denied defendant's motions for change of venue.

### 2. Jury Selection

#### a. Manner of conducting voir dire

Defendant contends the trial court violated his right to a fair trial by limiting race-related questions in the juror questionnaire and in individualized voir dire. As we will explain, neither of these contentions has merit.

##### (1) Adequacy of questioning on potential racial bias

As noted, defendant's first trial ended in a mistrial, with a holdout juror who was the lone African-American. In preparation for the second trial, defendant submitted to the trial court a proposed juror questionnaire that contained 14 questions regarding racial bias. The trial court rejected five of defendant's proposed questions on racial bias and permitted nine to remain.

A defendant is entitled to question prospective jurors on the issue of possible racial bias. (*People v. Taylor* (2010) 48 Cal.4th 574, 608 (*Taylor*).) A trial court, however, has wide discretion in deciding what questions should be

30

asked on voir dire to determine potential jurors' biases. (*Ibid.*) "It abuses that discretion if its failure to ask questions renders the defendant's trial ' "fundamentally unfair" ' or ' " 'if the questioning is not reasonably sufficient to test the jury for bias or partiality.' " ' " (*Ibid.*; see Code Civ. Proc., § 223.)

The trial court here permitted nine questions on racial bias. For the five questions it did reject, the court explained those questions duplicated other questions, sought information on a "collateral" issue, or were phrased in a biased or nonneutral manner. In light of the nine questions the court did permit, we cannot say it abused its discretion in rejecting these five questions for these reasons. In addition, the court instructed counsel to submit a list of questions for further examination by the court for each prospective juror. Thus, defendant had the opportunity to further explore any potential juror's possible racial bias.

To the extent defendant contends the trial court erred by not allowing a juror from his first trial to testify about that jury's deliberations, and even if we assume such evidence would be admissible (see Evid. Code, § 1150), such testimony would not have been helpful in determining possible racial bias in the second trial's venire. Thus, on the record before us, we conclude the court's inquiry into possible racial bias was sufficient.

> *(2) Denial of motion for individual sequestered voir dire*

Defendant contends the trial court erred in denying his motion to allow counsel to conduct voir dire of each prospective juror individually and separately from the other prospective jurors. He argued individual voir dire was necessary because the cross-racial nature of the case was likely to evoke racial biases. The court denied the request to conduct sequestered voir dire on any issue, stating it did not believe race was "a huge issue in this case." We review the denial of a

31

defendant's motion for individual sequestered voir dire for abuse of discretion. (*Famalaro*, *supra*, 52 Cal.4th at p. 34.)

Individual sequestered voir dire is not constitutionally required, even in a capital case. (See *Taylor*, *supra*, 48 Cal.4th at p. 606.) Moreover, section 223 of the Code of Civil Procedure states, in pertinent part, that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors . . . ." Group voir dire may be impracticable when it is shown to result in actual, rather than merely potential, bias. (*Taylor*, *supra*, 48 Cal.4th at p. 606.) Defendant does not suggest that either the trial court's comments or the responses of other prospective jurors influenced any prospective juror. Rather, he contends the nature of group voir dire coerced the prospective jurors into giving "socially acceptable answers," and not giving honest answers about their actual biases. Although prospective jurors may have been influenced by others' responses, and by having to respond in front of others, this is, at most, potential rather than actual bias. (*Lewis*, *supra*, 43 Cal.4th at pp. 494-495.) Moreover, prospective jurors individually completed the written questionnaires, and the court indicated it would question prospective jurors individually about their views on the death penalty; it added, however, that any "sensitive" matter could also be discussed "in confidence." Thus, defendant could have asked to examine a prospective juror's possible racial biases privately. Defendant did not make such a request. Accordingly, on the record before us, we conclude the court did not abuse its discretion in denying defendant's request for individual sequestered voir dire.

### b. Batson/Wheeler *challenge*

Defendant contends the prosecutor improperly exercised peremptory challenges against two African-American prospective jurors, H.C. and K.P., on the basis of race. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v.*

32

*Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).)

The applicable law is settled. "Under *Wheeler,* ' "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias — that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds' — violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.]" ' [Citation.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]

"In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' ([*Johnson, supra*, 545 U.S. at p. 168], fn. omitted.)" (*People v. Streeter* (2012) 54 Cal.4th 205, 221 (*Streeter*).) The United States Supreme Court did not intend a movant's burden at the first, prima facie, stage "to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the

33

trial judge to draw an inference that discrimination has occurred." (*Johnson*, *supra*, 645 U.S. at p. 170.)

Three of the 69 prospective jurors in the jury pool were African-American.[6] Without objection, the prosecutor exercised his sixth peremptory challenge to excuse H.C., who was African-American. After the prosecutor used his 12th peremptory challenge to excuse K.P., another African-American, defendant made a *Wheeler* motion, citing the prosecutor's excusal of H.C. and K.P.[7] In support of his motion, defendant claimed African-Americans were underrepresented in the venire, noted the holdout juror from his first trial was African-American, and argued the prosecutor excused H.C. and K.P. because he feared they would vote not guilty.

Without expressly stating the standard it was employing, the trial court denied the motion, finding defendant had failed to make a prima facie showing. The prosecutor declined the trial court's invitation to state his reasons for excusing H.C. and K.P., but noted that roughly five percent of the population in Kern County was African-American. The prosecutor also stated that the trial court and the attorneys were "all aware" that the holdout juror from defendant's first trial was African-American, but noted this juror had voted to convict defendant of the

---

[6] Defendant notes of the 140 prospective jurors originally summoned by the trial court, only four were African-American. The court denied defendant's motion to discharge the venire due to the underrepresentation of African-Americans, and he does not challenge this ruling on appeal. Many of the original 140 prospective jurors were excused due to their views on the death penalty or the financial hardship that a lengthy trial would have caused them.

[7] A *Wheeler* motion preserves the federal constitutional claim that a prosecutor used a peremptory challenge based solely on the juror's race. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.) K.P. was multiracial, but for the purposes of defendant's *Wheeler* motion, she was considered to be African-American.

Torigiani burglary.  One African-American woman ultimately served on defendant's jury.

Although the trial court did not articulate the standard it was using, we will assume it used the wrong one, that is, whether defendant established a "strong likelihood" that a juror was peremptorily challenged on the basis of race. (*Streeter*, *supra*, 54 Cal.4th at p. 222 [articulating the standard under *Wheeler*, *supra*, 22 Cal.3d at p. 280].)  After defendant's trial, the high court disapproved of that standard for the purposes of establishing a prima facie showing.  (*Johnson*, *supra*, 545 U.S. at pp. 166-168.)  Instead, a defendant has the burden of showing that the circumstances of the case raise an inference that the prosecutor excluded a prospective juror based on race.  (*Batson*, *supra*, 476 U.S. at p. 96.)  Regardless of which standard the trial court used, we independently review the record and apply the standard required by the high court.  (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*).)

Although a prima facie showing may be made from any evidence in the record, we have noted "certain types of evidence that will be relevant for this purpose.  Thus the party may show that [opposing counsel] has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of . . . peremptories against the group.  [The moving party] may also demonstrate that the jurors in question share only this one characteristic — their membership in the group — and that in all other respects they are as heterogeneous as the community as a whole.  Next, the showing may be supplemented when appropriate by such circumstances as the failure of [opposing counsel] to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.  Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if [the defendant] is, and especially if in

35

addition [the] alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Wheeler*, *supra*, 22 Cal.3d at pp. 280-281, fn. omitted.)

Defendant's motion primarily relied on the relative dearth of African-American prospective jurors, and the fact that the prosecutor exercised peremptory challenges against the two who had been called to the jury box at the time he made his motion. This numerical showing alone, however, falls short of a prima facie showing (see *Streeter*, *supra*, 54 Cal.4th at p. 223, and cases cited therein) because the small number of African-Americans in the jury pool makes "drawing an inference of discrimination from this fact alone impossible." (*Bell*, *supra*, 40 Cal.4th at pp. 597-598 [no inference of discrimination when prosecutor excused two of the three African-American women on the panel]; see *People v. Bonilla* (2007) 41 Cal.4th 313, 343 [" ' "As a practical matter . . . the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion." ' [Citations.]"].)

Defendant fails to demonstrate that the totality of relevant facts give rise to an inference of discriminatory purpose as the record also shows apparent race-neutral reasons for the prosecutor's excusals of Prospective Jurors H.C. and K.P. H.C. was the head basketball coach at the university Manning attended and knew eight of the potential witnesses because they too worked at the university; he knew James Ave and Carolyn Krone, both of whom testified at defendant's trial. No other prospective juror knew eight potential witnesses, and the prosecutor could have reasonably been concerned that H.C. was potentially too closely connected to the case to sit as an impartial juror. Although the record indicates Ave and Krone testified about relatively minor, uncontested matters, the prosecutor may have been concerned about the expected testimony of the six other potential witnesses that H.C. knew. Moreover, on his juror questionnaire, H.C. expressed support for

36

the death penalty, but also indicated that he or someone close to him had had a bad experience with someone of another race; he or someone close to him had been discriminated against; the fact that defendant, like H.C., was African-American would make it more difficult for H.C. to consider the facts objectively; he knew or thought he knew a member of defendant's family; and, due to his prominent status at the university, his "path[] might have crossed" defendant's or Manning's.

With respect to K.P., she stated that her adolescent brother had been charged with selling marijuana (a felony; see Health & Saf. Code, § 11360, subd. (a)) and thus had a case pending in the Kern County juvenile court system at the time of defendant's trial. Although on voir dire K.P. stated that her brother's case would not affect how she viewed defendant's case, the prosecutor could reasonably have been concerned that a person might be biased against the prosecution and law enforcement agencies that were *currently* prosecuting her brother. (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 167, fn. 13 [family member's negative experience with the criminal justice system is a race-neutral reason for a peremptory challenge].) K.P. also explained that jury service would force her to drop some of her summer school classes, which she feared would interfere with her ability to transfer to a four-year college. The prosecutor also reasonably could have concluded that K.P.'s concerns about completing her education might impair her ability to focus on the case and serve as an impartial juror.

For the first time on appeal, defendant asks us to conduct a comparative analysis of the prospective jurors' responses on the jury questionnaire and during voir dire. When a trial court has found no prima facie showing, and the prosecutor has declined to state reasons for the excusals, we have declined to conduct a comparative juror analysis. (*Streeter*, *supra*, 54 Cal.4th at p. 226, fn. 5; but see *United States v. Collins* (9th Cir. 2009) 551 F.3d 914 [comparative juror analysis

37

employed for first-stage *Batson* case].)  Justice Liu's concurring opinion argues that we must conduct a comparative juror analysis in this situation.  But even if we were to do so, a comparative juror analysis does not aid defendant because the record fails to show that any seated or alternate juror personally knew eight potential witnesses, as H.C. did.  Detective Herman, the detective to whom defendant first admitted to having sex with Manning, was the father of a friend of one of the seated jurors, but this juror had never met Detective Herman.  Similarly, another seated juror recognized the prosecutor but did not know him, knew two people employed by local law enforcement agencies, and had a working relationship with three people in the prosecutor's office because his employer had an "automation" contract with the prosecutor's office.  This juror, however, did not know anyone associated with this case.  Alternate Juror R.C. worked at the Kern County jail as a registered nurse, his wife was a court reporter, and his brother was a deputy sheriff.  R.C. knew one of the potential witnesses, an inmate, through his work.  R.C. heard a detention officer refer to defendant as "scum" or a "scumbag."  R.C. thought he might have treated defendant.  This was far less contact with potential witnesses than H.C. had, and neither this potential witness nor defendant testified.

In any event, that other prospective or seated jurors who were not peremptorily challenged also may have had possible biases similar to H.C.'s is not determinative because the *combination* of H.C.'s potential biases made him sufficiently different from other jurors who had been evaluated at the time the prosecutor excused him.  (See *People v. Mai* (Aug. 26, 2013, S089478) __ Cal.4th __, __ [at pp. 83-84] [affirming prosecutor's use of a peremptory challenge because a prospective juror's age, familial status, and death penalty views, when considered together, made her unique among the jurors evaluated up to that

38

point].)  No other seated or prospective juror knew so many potential witnesses and expressed doubt about his or her own ability to remain objective.

With respect to K.P., four seated jurors either had suffered a misdemeanor conviction or were close to someone who had suffered one; three of these convictions occurred in Kern County.  Another juror had suffered a misdemeanor conviction in Kern County and had a best friend who had suffered a felony drug conviction in Kern County.  The brother of one seated juror had been convicted of child molestation and was in prison.  Unlike K.P.'s brother's case, however, none of these was *pending* in the very county where defendant was being tried.  K.P. also expressed concern that jury service would hinder her ability to transfer to a four-year college.  In *Snyder v. Louisiana* (2008) 552 U.S. 472, 483-484, among the prosecutor's justifications for peremptorily challenging an African-American prospective juror was the concern that he might be inclined to favor a lesser sentence to lessen the trial's impact on his graduation requirements.  The high court rejected this justification, in part, because the trial court had learned from the prospective juror's university that jury service would not significantly interfere with his education requirements; the prosecutor also had accepted two Caucasian jurors who had at least as serious hardships as the challenged prospective juror. (*Ibid.*)  Although the trial court here had some personal knowledge of the local colleges, unlike in *Snyder*, K.P. did not receive assurances that jury service would not interfere with her education plans.  Justice Liu's concurring opinion notes (conc. opn. of Liu, J., *post*, at p. 22) a seated juror also explained that jury service would interfere with her ability to take summer school classes, but this juror was not trying to transfer to another college and she "probably" could take any missed classes during the next school year.  The concurring opinion also notes (conc. opn. of Liu, J., *post*, at p. 22) one seated juror was the sole manager of an American Legion post who had expressed concern about his ability to find

39

someone to replace him for the full length of the trial, but this juror was a *volunteer* and thus would not have suffered any economic hardship by serving on the jury; he also previously had been able to find a substitute for "one or two weeks."**8** Moreover, as with H.C., the combination of K.P.'s potential biases differentiated her from other prospective jurors. (See *ante*, at p. 38.)

In response to the general comments in Justice Liu's concurring opinion about this court's *Batson/Wheeler* jurisprudence, and his suggestion that trial judges and appellate courts, or at least this court, have not adequately addressed racial discrimination that is occurring during jury selection in California's courts, it is true that this court has rejected most claims of *Batson/Wheeler* error during the last two decades. We note, however, that trial court rulings *sustaining* a *Batson/Wheeler* objection rarely if ever see appellate review or even mention in an appellate opinion; only trial court rulings finding no improper use of peremptory challenges are reviewed in appellate opinions. As the high court observed in *Batson*, "We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." (*Batson*, *supra*, 476 U.S. at p. 97.) Each case raising a *Batson/Wheeler* issue is considered on its own merits. As here, we have carefully reviewed the record and considered the question closely in every case before us raising this issue.

Because defendant failed to meet his burden in establishing a prima facie showing of group discrimination, the trial court properly denied his *Wheeler* motion.

---

**8** Defendant's first trial lasted 11 court days and his second trial lasted 12 court days.

## c. Denial of challenge for cause

Defendant contends the trial court erroneously denied his challenge for cause against R.C., a nurse at the Kern County jail who served as an alternate juror.

R.C. stated if he served on the jury, it would not be a problem for him to vote not guilty and resume working at the jail. Defendant moved to excuse for cause, arguing that if R.C. voted not guilty, he would be returning to a "hostile work environment," and therefore would be biased toward the prosecution. The trial court denied defendant's motion, stating, "I have to make this call based upon what he has told us. He has told us he can be fair."

R.C. was seated as an alternate juror. Defendant did not exercise a peremptory challenge against R.C., or exhaust all of his peremptory challenges for the alternate jurors, and he did not express dissatisfaction with the panel of alternate jurors. R.C. never served as a juror during defendant's trial.

The Attorney General contends defendant has forfeited this claim. We agree. " ' "[A] defendant who wishes to preserve a claim of error in the improper denial of a challenge for cause must (1) use a peremptory challenge to remove the juror in question; (2) exhaust his or her peremptory challenges or justify the failure to do so; and (3) express dissatisfaction with the jury ultimately selected." ' [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 130 (*Souza*).)

Defendant contends his claim is not forfeited because he intentionally did not exercise his last peremptory challenge when selecting the jury and expressed dissatisfaction with the seated jury. Defendant also claims the trial court improperly rehabilitated prospective jurors who would otherwise have been excused for cause, which he asserts justified his decision to not exhaust his

41

peremptory challenges when selecting the jury.[9]  These circumstances do not save defendant's claim because he did not use a peremptory challenge to remove R.C., he failed to justify his decision to not exhaust his peremptory challenges with respect to the alternate jurors, and he failed to express dissatisfaction with the alternate jurors that were selected.  (See *Souza*, *supra*, 54 Cal.4th at p. 130.)  Moreover, as R.C. never served on defendant's jury, there is no possibility that any assumed error could have been prejudicial.  (*People v. Thomas* (2012) 54 Cal.4th 908, 935 & fn. 7.)

## B.  Guilt Phase

### 1.  Admission of DNA Evidence

Citing *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), defendant contends he was denied his federal constitutional right to confront the individual who determined the statistical frequency that his DNA was consistent with the samples recovered from the crime scene.  As noted, a deputy director for the laboratory that analyzed the DNA samples testified at defendant's trial; this witness had not personally performed the DNA analysis.

The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses.  (See *People v. Lopez* (2012) 55 Cal.4th 569, 576.)  In addition, the prosecution may not rely on "testimonial" out-of-court statements unless the witness is unavailable to testify and the defendant had a prior

---

**9**     To the extent defendant contends the trial court engaged in other practices to ensure a "designer jury" for the prosecution, we are not persuaded.  Defendant contends the trial court's questioning of Prospective Jurors P.P. and V.G. were improper attempts to make them acceptable jurors.  After reviewing the record, we cannot say the trial court abused its broad discretion in its manner of questioning the prospective jurors.  (See *People v. Whalen* (2013) 56 Cal.4th 1, 29-36.)  Moreover, defendant successfully challenged Prospective Juror V.G. for cause, and Prospective Juror P.P was never called into the jury box.

42

opportunity for cross-examination.  (*Crawford*, *supra*, 541 U.S. at p. 59; cf. *Williams v. Illinois* (2012) 567 U.S. ___  [132 S.Ct. 2221] (plur. opn.) [even if the report of DNA test results was admitted for its truth, it was not testimonial in nature]; *Lopez*, *supra*, 55 Cal.4th at pp. 580-585 [inculpatory portions of report on defendant's blood-alcohol concentration were not testimonial in nature].)

The Attorney General contends defendant forfeited this claim by failing to object at trial.  (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1160-1161 (*Livingston*); Evid. Code, § 353.)  *Crawford*, which was a dramatic departure from prior confrontation clause case law, was decided after defendant's 1999 trial, and defendant's failure to object is excusable because defense counsel could not reasonably have been expected to anticipate this change in the law.  (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462.)

We need not address the merits of the claim because, even if there was error, it was harmless beyond a reasonable doubt.  (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681-684; *Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant admitted that he had sex with Manning on the night of her murder.  The DNA analysis only confirmed what defendant had already admitted.  The primary issue at trial was whether the sex was consensual, and the DNA analysis provided no insight as to this issue; defendant therefore could not have been harmed by any presumed prejudice.

### 2. *Admission of Torigiani Burglary*

Defendant contends the trial court erred by admitting during his second trial evidence of the burglary of Bree Torigiani's condominium.  As noted, the jury in defendant's first trial found him guilty of this crime.

Before the start of defendant's second trial, the prosecutor requested the trial court to determine whether he could introduce evidence of the Torigiani

burglary.  The prosecutor noted the similarities between the crimes:  similar dwellings in close proximity to each other and to defendant's apartment; the crimes were committed in the evening, within three weeks of each other; similar items were taken; the victims were women; and the perpetrators armed themselves with items from the dwellings.[10]  In opposing the request, defendant noted that he knew Manning, unlike Torigiani, and had been in her apartment before; the Torigiani burglary happened after Manning's murder; he entered Torigiani's condominium through the window, but there was no sign of forced entry into Manning's apartment; when confronted by Torigiani, he fled; and no jewelry was taken from Manning, unlike Torigiani.  The court ruled the facts of the Torigiani burglary were admissible, but it excluded evidence that defendant had been convicted of the Torigiani burglary.  The court instructed the jury it could consider the Torigiani burglary only for the limited purposes of determining the identity of the person who committed the crimes against Manning and the perpetrator's intent.

Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  (Evid. Code, § 1101, subd. (a).) Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity.  (*Id.*, § 1101, subd. (b).)  We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion.  (See *People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).)

---

[10]    Torigiani testified at defendant's first trial that a bayonet owned by her brother had been moved from underneath his bed to near her bedroom door.

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish . . . the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Id.* at p. 403.)

Defendant first contends there were insufficient similarities to link the Torigiani burglary with his intent when he entered Manning's apartment. Burglary is defined, in pertinent part, as the entry into a dwelling with the intent to commit larceny or any felony. (§ 459.) It is undisputed that defendant did not enter Torigiani's condominium with the intent to rape or murder her; thus, the Torigiani burglary was relevant only to whether he entered Manning's apartment with a larcenous intent.

We see no abuse of discretion. Although the crimes were not identical, they were sufficiently similar. In both cases, defendant entered a woman's dwelling within walking distance of his own apartment at night, and stole several items. That defendant committed the Torigiani burglary supports the reasonable inference that he also intended to steal from Manning's apartment. Although the

45

jury ultimately did not convict defendant of burglarizing Manning's apartment, this does not lead to the conclusion that the trial court abused its discretion in allowing the introduction of the evidence.

Defendant next contends the court abused its discretion in not finding the evidence unduly prejudicial. (See Evid. Code, § 352.) We disagree. The facts of the Torigiani burglary were not particularly inflammatory when compared to Manning's rape and murder. Moreover, the trial court instructed the jury on the limited purpose of this evidence, and we presume it followed the instruction. (See *Jones*, *supra*, 51 Cal.4th at p. 371.)

Defendant also contends the trial court abused its discretion by allowing the jury to consider the Torigiani burglary as evidence of the identity of the person who burglarized Manning's apartment. Even assuming the court did abuse its discretion in permitting the jury to consider the Torigiani burglary for this additional purpose, any such error was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Defendant admitted to being in Manning's apartment on the night she was murdered, and there was sufficient evidence to support his convictions for rape and murder. Moreover, the jury did not convict defendant of the burglary of Manning's apartment, and thus evidence of the Torigiani burglary could not have prejudiced him with respect to this count.

### 3. *Admission of Manning's Letters*

Defendant contends the trial court abused its discretion in admitting into evidence two undated letters written by Manning. As noted, one letter was addressed to "Charles sweetheart," and described her love for Hill; the other was addressed to a friend and discussed her postgraduation plans with Hill.

Defendant first contends these letters were irrelevant. In the absence of a contrary rule, all relevant evidence is admissible. (Evid. Code, § 351.) Evidence

46

is relevant if it has any tendency to prove or disprove a contested fact at issue. (*Id.*, § 210.) In the case of forcible rape, evidence of any circumstance that makes it less plausible that the victim consented to sexual intercourse is relevant. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1114, overruled in part on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Defendant's protestations notwithstanding, evidence that Manning had professed her love for Hill a week before her murder, and had written a friend about her postgraduation plans with Hill, tended to make it less plausible that she would have had consensual sex with another person. As such, the letters were relevant and admissible.[11]

Defendant further contends the letters were unreliable hearsay. Manning's letters were out-of-court statements, but "an out-of-court statement is hearsay only when it is 'offered to prove the truth of the matter stated.' (Evid. Code, § 1200.)" (*People v. Jurado* (2006) 38 Cal.4th 72, 117 (*Jurado*).) Much of what Manning wrote, such as her future plans, was not hearsay in the first place because the statements were offered solely as circumstantial evidence of her then state of mind, specifically, her feelings for Hill, and were not offered to prove the truth of what she wrote. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 822-823 (*Riccardi*) [distinguishing between "statements that were admissible as hearsay under Evidence Code section 1250, and statements that were nonhearsay"]; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 (*Ortiz*).) Thus, such statements were properly admitted.

---

[11] Defendant also contends the trial court erred in ruling the nature of Manning's relationship was put "in issue" by defendant. Lack of consent is an element of forcible rape, and thus is always a fact to be proved or disproved, and as noted, the nature of Manning's relationship with Hill was relevant to the issue of consent.

On the other hand, other statements in Manning's letters, such as "I love you," were introduced for the truth of what she wrote, and thus were hearsay. (See Evid. Code, § 1200; see also *Jurado*, *supra*, 38 Cal.4th at p. 129 ["assertions and descriptions of [defendant declarant's] own feelings and other mental states, were hearsay"].) These statements, however, were admissible under the Evidence Code section 1250's state-of-mind exception; as discussed above, the victim's state of mind was at issue. (See *Ortiz*, *supra*, 38 Cal.App.4th at p. 389.)

Defendant nonetheless contends Manning's letters were not a trustworthy representation of her state of mind on the night of her murder. A hearsay statement that would otherwise be admissible under the state-of-mind exception (Evid. Code, § 1250, subd. (a)(1)) is inadmissible if made under circumstances that indicate the statement's lack of trustworthiness (*id*., § 1252). A statement is trustworthy within the meaning of section 1252 of the Evidence Code when it is " 'made in a natural manner, and not under circumstances of suspicion . . . .' " (*People v. Ervine* (2009) 47 Cal.4th 745, 778-779.) Defendant does not contend Manning was coerced into writing the letters or wrote them with an intent to deceive, and he does not dispute the circumstances of their origins.[12] (See *Riccardi*, *supra*, 54 Cal.4th at p. 822 ["None of her statements were made to law enforcement or other persons to whom there may have been an incentive to lie or exaggerate"].) He argues, instead, that the letters fail to demonstrate Manning's state of mind at the time of her murder, which occurred approximately a week

---

[12] Although the letters were undated, it is possible to determine when they were written. In the letter to her friend, Manning wrote there were 31 days until graduation; Bucholz testified Manning was to graduate on June 14. In the "Charles sweetheart" letter, Manning wrote that she was writing a "paper." Bucholz testified Manning had started writing a paper for a class about a week before she was killed.

48

after she wrote them. This argument misses the mark, as the letters were relevant because they reflected the status of Manning and Hill's relationship prior to her death. Defendant argues Manning's feelings may have changed during the ensuing week because she never mailed the letters, and she and Hill discussed ending their relationship after she had written them. But whether their relationship changed after she had written the letters went not to their trustworthiness of their origins but rather to the weight, if any, the jury ought to place on the letters when determining her state of mind on the night of her murder.

Therefore, we conclude the trial court did not abuse its discretion in admitting Manning's letters into evidence.

### 4. Ruling on Admission of Blood Evidence

Defendant contends the trial court abused its discretion by indicating it would allow the prosecutor to introduce blood evidence that arguably linked him to Manning's murder. Prior to the start of defendant's second trial, he successfully moved to limit the testimony about a bloodstain found on one of his shoes in his closet: the trial court ruled the only evidence with respect to the bloodstain it would allow to be introduced was that defendant and Manning had been excluded as primary donors.[13] During the second trial, defendant sought to elicit testimony from a criminalist that no blood had been found on the shirt defendant had been wearing on the night of the murder. At a conference outside the jury's presence

---

[13] At defendant's first trial, a deputy director for the laboratory that performed the DNA analysis testified one of defendant's shoes contained a spot of blood that came from more than one donor. Defendant and Manning were excluded as primary donors of the blood, and the results were too "faint" to either include or exclude them as secondary donors. On cross-examination, the deputy director conceded the sample of the secondary donor's blood was so faint that it may not have been human blood.

49

and over defendant's objection, the court ruled that if he inquired about the lack of blood on the shirt, the prosecutor would be allowed to introduce evidence of the blood that had been found on his shoe. In light of the court's ruling, defendant did not inquire about the lack of blood on his shirt.

Evidence Code section 352 provides that a court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's ruling under this section for abuse of discretion. (See *People v. Valdez* (2012) 55 Cal.4th 82, 133 (*Valdez*).)

Defendant first contends the trial court erred because the record does not affirmatively show that it weighed the prejudice of the evidence against its probative value. A trial court's weighing, however, may "be inferred from the record despite the absence of an express statement by the trial court." (*Prince*, *supra*, 40 Cal.4th at p. 1237.) The record indicates the court understood defendant's objection was based on section 352 of the Evidence Code, and its earlier ruling excluding much of the evidence about the blood on his shoe demonstrates that it understood its duty to exclude confusing or unduly prejudicial evidence. Although the court did not expressly state that it weighed the evidence, from its ruling we may infer it did and determined that, in light of the evidence about the lack of blood on his shirt, the probative value of evidence of blood on his shoe outweighed any undue prejudice.

Defendant contends the trial court abused its discretion in ruling that evidence about the lack of blood on his shirt "open[ed] the door" to inquiring about the blood on his shoe, as neither he nor Manning was the primary donor of the blood on his shoe. Moreover, defendant observes, there was no evidence he wore that particular shoe on the night of the murder.

50

The DNA analysis undisputedly excluded defendant and Manning as primary donors of the blood found on the shoe. But the evidence did not exclude either of them as possible secondary donors. In *People v. Burgener* (1986) 41 Cal.3d 505, 526-527, overruled in part on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743, we held that evidence of a substance that *might* have been human blood on the defendant's shoe at the time of his arrest tended to prove that he had previously been at a bloody scene, and thus was relevant. Similarly, evidence that a bloodstain on defendant's shoe may have come from more than one donor, and that neither defendant nor Manning could be excluded as a possible secondary donor, did have some tendency to prove he was in Manning's apartment the night she was murdered. Defendant contends the trial court's ruling prevented him from introducing evidence of the absence of blood on the clothes he wore the night of the murder, but his girlfriend Findley testified there was nothing unusual about his appearance on the night of Manning's murder, which implied there was no blood on his clothes.

We see no abuse of discretion. Even if we assume the ruling constituted an abuse of discretion, it was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

### 5. *Exclusion of Evidence of Manning's Relationship with Hill*

Defendant contends the trial court abused its discretion in excluding evidence of problems in Manning and Hill's relationship. At his first trial, defendant attempted to cross-examine Bucholz about whether Manning had expressed any opinions about Hill's association with one of his friends, but the court sustained the prosecutor's relevance objection. Outside the jury's presence, the court ruled defendant could inquire whether Manning had expressed any doubts about the relationship, but barred testimony about the specific reasons why Manning was having doubts. The court also ruled that defendant could not ask

51

Hill if he had been arrested, but could ask if Hill and Manning had fought over his drug use. Defendant, who assumed these evidentiary rulings from his first trial applied to his second trial, contends these evidentiary rulings prevented him from inquiring about these topics during his second trial.

At his second trial, defendant did not inquire about Hill's drug use, but, as noted, the jury heard testimony that Manning and Hill had discussed ending their relationship because he was spending too much time with his friends, and because she feared he might have given her a sexually transmitted disease.

The Attorney General preliminarily contends this issue is forfeited because defendant is complaining about evidentiary rulings from his first trial, and he did not attempt to introduce this evidence during his second trial. As defendant notes, however, before his second trial, the trial court renewed its prior orders from the first trial. Defendant therefore has not forfeited this claim. (Cf. *People v. Richardson* (2008) 43 Cal.4th 959, 1002.)

This claim, however, lacks merit. With respect to whether Hill's friendships were a cause of friction between him and Manning, the jury in his second trial heard testimony on this subject. With respect to Hill's drug use, the trial court ruled defendant could inquire whether Hill and Manning fought over his drug use; the court's ruling did not exclude any evidence on this subject. With respect to whether Hill had been arrested, the court did not abuse its discretion in excluding such evidence under Evidence Code section 352 as unduly prejudicial and collateral to the relevant issue, that is, the status of Manning and Hill's relationship. Moreover, any presumed error was harmless (see *Watson*, *supra*, 46 Cal.2d at p. 836) because the jury heard evidence that Manning and Hill had fought over a variety of subjects, and had considered ending their relationship.

### 6. Exclusion of Expert Testimony

Defendant contends the trial court abused its discretion by sustaining two objections to questions posed during his direct examination of one of his expert witnesses. As noted, Dr. Stanley, an obstetrician/gynecologist and infertility specialist, testified about the indicia of sexual trauma found on Manning's body. Dr. Stanley described the procedures commonly used in the examination of rape victims to determine whether a rape had occurred. Defense counsel asked if any of these procedures were used in Manning's case; before Dr. Stanley could answer, the trial court sustained the prosecutor's hearsay objection. Defense counsel then asked if Dr. Stanley knew whether any of these procedures were used in Manning's case, and the court sustained the prosecutor's objection based on the doctor's lack of personal knowledge. Defendant contends these rulings prevented him from challenging the adequacy of the examination performed on Manning.

Any witness may testify about matters within his or her personal knowledge. (Evid. Code, § 702, subd. (a).) Expert testimony in the form of an opinion may be based on hearsay or facts outside the personal knowledge of the expert. (See *id.*, § 801, subd. (b).)

The trial court's rulings were proper because defense counsel inquired about what procedures were actually used during the autopsy, and there was no evidence demonstrating Dr. Stanley had such personal knowledge. Although it would appear defendant was attempting to examine Dr. Stanley about his opinion of the sufficiency of the examination, he did not actually ask that question. In any event, any presumed error was harmless (see *Watson*, *supra*, 46 Cal.2d at p. 836) because the forensic pathologist who performed Manning's autopsy testified about the procedures actually used.

53

### 7. Denial of Mistrial Motion

Before defendant's first trial, the trial court granted his motion to exclude references to his using the word "bitch." Before the second trial, the court renewed its orders from the first trial. On direct examination by the prosecutor during the second trial, Detective Bob Stratton testified that defendant had said to him, "I'm conniving just like you're conniving, but I didn't kill the bitch." Outside the presence of the jury, defendant moved for a mistrial based on the detective's violation of the court's order. The court refused to grant a mistrial, but offered to either strike the statement or to instruct the jury that African-American males use the word "bitch" in a nonpejorative manner. Defense counsel agreed to the latter solution, and before the detective resumed testifying, the court informed the jury that it was taking judicial notice that "in our society young African-American males frequently use the word bitch in a nonpejorative fashion, whereas it is generally true that Caucasian males and Hispanic males, if they used that word, are using it in an angry fashion with regard to females."

Defendant contends the trial court abused its discretion by denying his motion for a mistrial. " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions . . . ." [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' [Citation.] 'Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' [Citation.]" (*People v. Dement* (2011) 53 Cal.4th 1, 39-40.)

54

The trial court did not abuse its discretion in denying defendant's motion because the detective's prohibited testimony was brief, and "[j]urors today are not likely to be shocked by offensive language." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1009; see *People v. Halsey* (1993) 12 Cal.App.4th 885, 891 [no abuse of discretion in allowing testimony that the defendant called the victim a " 'son of a bitch' "].) We are mindful of the interracial and sexual nature of the crime, but evidence that defendant once referred to Manning as "the bitch" was not so incurably prejudicial that a new trial was required. Moreover, the court promptly attempted to remedy the situation by explaining its belief that the term was not likely used in a pejorative manner.

In his reply brief and second supplemental brief, defendant contends the prosecutor intentionally solicited the detective's testimony about defendant's use of the word "bitch." The detective's testimony was in response to the prosecutor's asking him to "describe specifically" defendant's use of the word "conniving." Defendant contends the prosecutor asked this question because he knew that defendant had used those two words in the same sentence.

Because defendant did not raise this basis for his motion at trial, he has forfeited the claim on appeal. (See *Livingston*, *supra*, 53 Cal.4th at pp. 1160-1161.) In any event, the record does not support defendant's reading. The prosecutor stated he "didn't obviously realize [the detective] was going to use the word bitch," and there is no indication that the trial court or defense counsel disbelieved the prosecutor's explanation.

In his second supplemental brief, defendant contends the trial court's purported taking of judicial notice of how different communities use the word "bitch" was improper. The Attorney General is correct that defendant invited this error by assenting to the court's remedy. (See *People v. Lee* (2011) 51 Cal.4th 620, 645 (*Lee*).) In any event, the Attorney General concedes, and we agree,

55

neither section 451 nor section 452 of the Evidence Code permits this kind of judicial notice.  The court's remarks, however, make clear it was attempting to suggest that the word has a nonpejorative meaning in some contexts.  Any error was harmless (*Watson*, *supra*, 46 Cal.2d at p. 836) because the error, if anything, was to defendant's benefit.

### 8.  *Sufficiency of Evidence*

Defendant contends the evidence was insufficient to support his rape and robbery convictions and the robbery-murder special circumstance finding.

"The standard of appellate review for determining the sufficiency of the evidence is settled.  On appeal, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]  In conducting such a review, we ' "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]  These same principles apply to review of the sufficiency of the evidence to support a special circumstance finding.  [Citations.]" (*Lee*, *supra*, 51 Cal.4th at p. 632.)

"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of

56

two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' " If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

### a. Rape

Forcible rape is "an act of sexual intercourse accomplished . . . [¶] . . . [¶] . . . against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).)

Defendant concedes he had sex with Manning on the night she was killed, but contends there was no evidence to support the inference that the sex was nonconsensual. Defendant notes there was no physical evidence of force related to the sexual intercourse: there were no bruises or abrasions on Manning's arms, wrists, legs, or pelvic region; and he had no scratches or bruises on him. Both the forensic pathologist and Dr. Stanley acknowledged that the lack of genital trauma did not preclude the possibility of a sexual assault, as "the 'absence of genital trauma is not inconsistent with nonconsensual intercourse.' [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1084, overruled in part on another point by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Manning suffered multiple blows to her head and had been stabbed at least 57 times, and the forensic pathologist testified these injuries could have rendered her unconscious, which would have explained the absence of injuries to defendant or vaginal trauma.

57

Manning's lack of consent was supported by substantial circumstantial evidence. In addition to the evidence of Manning's love for her boyfriend, Hill, there was evidence defendant and Manning had an acrimonious relationship: his constant phone calls to the apartment disrupted her studying and annoyed her; she had asked Bucholz to tell him to stop calling; and his girlfriend had called the apartment and threatened Manning, which prompted her to call the police and then later confront him and Bucholz. Moreover, a shard of glass was found underneath Manning's shorts, implying she had been hit with a glass object before her shorts were removed. In addition, Manning had accused Hill, not defendant, of exposing her to a sexually transmitted disease. From this, a reasonable juror could have concluded that Manning was sexually active only with Hill. The only evidence Manning engaged in consensual sex with defendant was his statements to the police, and he admitted to having lied to the police about other matters. Defendant also gave inconsistent stories as to his whereabouts on the night of Manning's murder. We conclude substantial evidence supported the rape conviction.

### b. Robbery and robbery-murder special circumstance

Robbery is "the felonious taking of personal property in the possession of another . . . and against [the person's] will, accomplished by means of force or fear." (§ 211.) If a defendant does not harbor the intent to take another's property at the time the force or fear is applied, the taking is a theft, not a robbery. (*People v. Burney* (2009) 47 Cal.4th 203, 253.) "[T]he special circumstance of murder during the commission of a robbery requires that the murder be committed 'in order to advance [the] independent felonious purpose' of robbery, but the special circumstance is not established when the felony is merely incidental to the murder." (*Ibid.*)

58

As the Attorney General concedes, in finding defendant not guilty of burglary, the jury necessarily must have concluded that the prosecutor failed to prove that defendant entered Manning's apartment with a larcenous intent. Therefore, to sustain defendant's conviction for robbery and the robbery-murder special circumstance, he had to have formed the intent to steal after entering Manning's apartment but before attacking her.

Defendant contends the evidence was insufficient to determine when he formed the intent to steal. We disagree. Defendant had been in the apartment several times previously, and therefore was familiar with its layout and contents. The jury could have inferred that once he realized he was alone in the apartment with Manning, he decided to seize the opportunity to rob her. Moreover, the Attorney General observes that the amount of time it took defendant to arm himself, attack and kill Manning, and then attempt to clean up could have supported the inference that his intent to steal was no afterthought. In light of this evidence, a reasonable trier of fact could have concluded that defendant decided to steal Manning's belongings before killing her. That the evidence may also support another scenario does not render the evidence insufficient to support the verdict. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1349.)

### 9. Prosecutor's Closing Argument

Defendant contends the prosecutor during his closing argument gave the jury a mistaken impression of the law and improperly "lured" it into finding that he had committed robbery. The prosecutor explained that burglary required a larcenous intent at the time of entry, but did not explain that robbery required a larcenous intent before the use of force. The prosecutor's failure, defendant contends, invited the jury to find him guilty of robbery without determining when he formed a larcenous intent.

59

As the Attorney General notes, defendant failed to object at trial, and therefore this claim is forfeited on appeal. In any event, the claim is meritless because the record indicates the prosecutor's definitions of robbery and burglary were correct. Finally, the trial court instructed the jury that if anything said by the attorneys conflicted with its instructions, the jury was to follow the court's instructions. Absent any evidence to the contrary, we presume the jury did so.[14] (See *Jones*, *supra*, 51 Cal.4th at p. 371.)

### 10. Objection to Defendant's Closing Argument

Defendant contends the trial court improperly prevented his counsel from presenting his closing argument. As noted, one of Manning's neighbors testified that around 10:00 p.m. on the night of the murder she saw someone carrying a television set in front of Manning's apartment, but was unsure who it was. During closing argument, defense counsel discussed a taped interview with the neighbor in which the prosecutor asked her about the person she had seen and when she saw him. Counsel told the jury: "Listen to the tape. . . . [The prosecutor] is looking for something that he can turn around and use against [the neighbor] later. . . . Why doesn't he ask those questions [about when the witness saw that person if they are] so important. And the answer is, because he is not going there to investigate, he is going there so he can find something to use against her when she testifies because — "

---

[14] To the extent defendant contends the trial court erred by not instructing the jury that the robbery charge required him to form a larcenous intent before attacking Manning, no such instruction was necessary: the court correctly instructed the jury on the elements of robbery, and defendant failed to request a clarifying instruction at trial, thus forfeiting this claim on appeal. (*People v. Bolden* (2002) 29 Cal.4th 515, 555-557.)

The prosecutor initially objected on the basis that defense counsel was "arguing outside any evidence," but then withdrew the objection. Defense counsel asked if he could continue, and the trial court replied, "No, you may not. Objection sustained."

Counsel has great latitude during closing argument to urge the conclusion he or she believes can be drawn from the evidence, but counsel may not argue facts not in evidence. (See *People v. Collins* (2010) 49 Cal.4th 175, 209.) A trial court may interpose and sustain its own objections. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 680.)

Even if we assume defense counsel's argument was a comment on the witness's purported inconsistencies, and that it was error for the trial court to sustain an objection, any error was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) The jury was free to consider what weight, if any, to give the neighbor's testimony, and the court's ruling did not significantly hamper defendant's ability to argue what inferences should be drawn from the evidence or otherwise present a defense. (See *People v. Frye* (1998) 18 Cal.4th 894, 945, overruled in part on other grounds by *People v. Doolin* (2008) 45 Cal.4th 390, 421, fn. 22.)

### 11. Jury Instructions

#### a. Third party culpability

Defendant contends the trial court's jury instruction on third party culpability erroneously omitted his theory of the case. The court instructed the jury, in pertinent part: "You have heard evidence that a person, person other than the defendant, may have committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilt beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your mind as to the defendant's guilt."

61

Defendant's proposed instruction also included the sentence, "Such evidence may, by itself, raise a reasonable doubt as to defendant's guilt," but the court granted the prosecutor's request not to instruct the jury with this particular sentence because it improperly commented on the weight of the evidence.

A trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case, but it need not give an argumentative or duplicative instruction.  (See *People v. Hartsch* (2010) 49 Cal.4th 472, 500 (*Hartsch*).)

Defendant contends the trial court's refusal to include this sentence "denuded" the instruction of its intended meaning, that is, that any admitted evidence of third party culpability was sufficient to raise a reasonable doubt.  We disagree.  As the trial court properly instructed the jury on reasonable doubt, third party culpability, sufficiency of the evidence, and the elements of the charged crimes, the jurors were entitled to consider each piece of evidence as they desired, and were free to give the evidence as much or as little weight as they deemed proper.  The proposed sentence was duplicative because the court's instruction correctly and adequately conveyed that evidence of third party culpability, by itself, was sufficient to raise a reasonable doubt.  As there was no need to highlight defendant's argument that evidence of a third party's culpability, by itself, could raise a reasonable doubt as to defendant's guilt, the court did not err by not giving the jury the proposed instruction.  The court's other instructions on reasonable doubt and burden of proof adequately conveyed this argument, and therefore defendant's proposed instruction was duplicative.  (See *Hartsch*, *supra*, 49 Cal.4th at p. 504 ["the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that the evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof."].)

### b. Felony-murder special circumstance

Defendant contends the trial court's written instruction on the felony-murder special circumstance was erroneous because it improperly listed the elements in the disjunctive, which impermissibly allowed the jury to find the special allegation true based on only one element. The trial court orally instructed the jury with a modified version of CALJIC No. 8.81.17 as follows: "To find that the special circumstance referred to in these instructions as murder in the commission of rape, sodomy, robbery or burglary is true, it must be proved: One, that the murder was committed while the defendant was engaged in the commission or attempted commission of a rape, sodomy, robbery and/or burglary; *and* two, that the murder was committed in order to carry out or advance the commission of the crime of rape, sodomy, robbery or burglary, or to facilitate the escape therefrom, or to avoid detection. In other words, the special circumstances referred to in these instructions are not established if the rape, sodomy, robbery or burglary was merely incidental to the commission of the murder." (Italics added.) The court's interlineated written instruction omitted the "and" before "two."

The Attorney General concedes it would be error if the instruction were written in the disjunctive. (See *People v. Friend* (2009) 47 Cal.4th 1, 79.) She correctly notes, however, the written instruction actually contained no connector. The court also provided the correct oral instruction. Absent the inclusion of an express disjunctive in the written instruction, the listing of the "separate elements that must be proved clearly implied that proof of *each* was independently necessary." (*Ibid.*) We acknowledge the interlineated written instruction was not a model of clarity, but even were we to assume it was ambiguous, there is no reasonable likelihood the jury applied it in an impermissible manner. (*Ibid.*)

63

### C. Penalty Phase

#### 1. *Juror Misconduct*

Defendant contends the trial court erred by denying his motion for a mistrial and by failing to dismiss a juror due to alleged misconduct.

Shortly after the jury had retired for penalty phase deliberations, the foreperson sent a note to the trial court indicating that Juror No. 6 felt defendant was trying to intimidate her. Juror No. 6 returned to the courtroom to speak with the court and counsel. She explained, "I was listening to the witness and I had glanced over towards the defendant. And me and [defendant] locked eyes. And he glared at me. And then he — he mouthed some words to me and then shook his head." When asked whether she could determine what defendant had mouthed, Juror No. 6 responded, "I could be wrong. I mean, I could have misunderstood what he was mouthing. But from what he said, I hate you." Regardless of whether she misunderstood the words, Juror No. 6 stated that defendant's eye contact was "confrontational" and seemed angry. Defendant and Juror No. 6 had briefly made eye contact one other time before this incident. She stated the encounter did not affect her ability to be fair or impartial. She felt she could continue to serve, but added, "I would perfectly understand if you guys thought otherwise." Juror No. 6 explained she had communicated this experience to the other jurors.

Defendant moved for a mistrial as to the penalty phase, arguing Juror No. 6's communication with the other jurors about what she had experienced was improper. The trial court denied the motion, stating it was proper for jurors to observe and consider what was happening in the courtroom. The court dismissed the jurors for the day to allow counsel some time to explore what remedial measures, if any, might be required.

64

On the next court day, the trial court denied defendant's request to further question Juror No. 6. Defendant moved to excuse Juror No. 6, arguing she lacked the ability to remain impartial, but the court denied the request.

The court then instructed the jury: "[A]s you know, you went out to deliberate on the penalty phase of the trial at about 3:30 p.m. on Friday afternoon. Thereafter, at about 4:30 p.m. . . . you sent out a note indicating that one of your number felt a threat, the defendant was trying to intimidate that juror. We spoke to the juror individually and the juror rejoined you briefly before we adjourned for the day. The juror told us [she] had shared with you the basis of [her] perception which was based on conduct of the defendant [she] had observed in the courtroom.

"Now, as jurors in the penalty phase of a capital trial, you can draw inferences based upon the defendant's demeanor in the courtroom, inasmuch as the defendant's character is at issue in this phase of the trial. However, you can only draw inferences based upon your personal observations, positive or negative, and not on what another juror may have observed. Nor may you speculate upon any ambiguous conduct of the defendant you have personally observed."

The trial court then asked, "Is there anybody who has any concern that anything that you have shared with the observation of that juror, as opposed to their ability to depend upon what they observed, versus your ability to depend on what you observed is going to keep you in any way from being a fair and impartial juror?" After each juror answered in the negative, deliberations resumed.

Section 1089 provides that a trial court may dismiss a juror if it finds the juror is unable to perform his or her duty, which includes engaging in serious and willful misconduct. (See *People v. Daniels* (1991) 52 Cal.3d 815, 866.) Defendant contends that Juror No. 6's observations were akin to her relying on extrajudicial information. " 'It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a

65

presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred.' [Citation.]" (*People v. Williams* (2006) 40 Cal.4th 287, 333.) The trial court's decision to discharge or retain a juror is reviewed for abuse of discretion. (See *People v. Osband* (1996) 13 Cal.4th 622, 675-676.)

During a penalty phase argument, a prosecutor may comment on a defendant's courtroom demeanor and behavior. (See *People v. Elliott* (2012) 53 Cal.4th 535, 588.) Similarly, in *People v. Williams* (1988) 44 Cal.3d 883, 971-972, in denying the capital defendant's automatic application to modify the verdict, the trial court relied in part on its observations of his courtroom demeanor. In affirming the trial court's ruling, we noted the court did not err because demeanor evidence was relevant in determining whether the defendant had expressed remorse or was otherwise worthy of sympathy. (*Ibid.*) If a judge as a finder of fact may rely on a defendant's courtroom demeanor during the penalty phase of a capital trial, and a prosecutor may comment on such behavior, then jurors may also rely on their own observations of a defendant. Defendant's reliance on *People v. Nesler* (1997) 16 Cal.4th 561, 579, is misplaced, as a juror in that case received extrajudicial evidence about the defendant at a bar and then conveyed it to the other jurors during deliberations. Unlike in *Nesler*, Juror No. 6 observed defendant's courtroom demeanor, which could have been observed by anyone present in the courtroom. We therefore reject the suggestion that a defendant's courtroom demeanor during the penalty phase of a capital trial — even if actually observed by only one person — is akin to extrajudicial information.

A significant theme in defendant's case in mitigation was his history of nonviolence; his courtroom demeanor therefore was relevant in evaluating the truthfulness of that evidence. Thus, if Juror No. 6 did rely upon what she observed in the courtroom in determining her vote, it was not misconduct for her to do so,

66

because her observations could have helped her to evaluate defendant's case. (See *People v. Williams*, *supra*, 44 Cal.3d at pp. 971-972.) Moreover, as a matter of policy, a defendant is not permitted to profit from his or her disruptive or otherwise improper misconduct. (See *People v. Williams* (1988) 44 Cal.3d 1127, 1154-1156.) To the extent defendant argues this incident caused her to become biased against him, Juror No. 6 told the trial court that she could remain fair and impartial, and the record discloses no evidence to the contrary.[15] Accordingly, the trial court did not abuse its discretion by retaining her as a juror.

Defendant contends Juror No. 6 committed misconduct by sharing her observations during deliberations, which exposed the remaining jurors to evidence about defendant that they did not personally observe. Even if we assume Juror No. 6 committed misconduct by relating her observations to the other jurors, any presumption of prejudice was adequately rebutted because the trial court instructed the jurors that they could not draw inferences based on what another juror may have observed. Absent evidence to the contrary, and we find none, we presume the jurors followed this instruction. (See *Jones*, *supra*, 51 Cal.4th at p. 371.) Moreover, during the hearing concerning Juror No. 6's observations, the court individually polled the jurors, and no juror indicated the incident would impair his or her ability to be fair and impartial. Accordingly, the court did not abuse its discretion in denying defendant's motion for a mistrial.

---

[15] To the extent defendant contends the trial court erred in denying his request to further examine Juror No. 6, we see no abuse of discretion because its inquiry was sufficient: it examined her about the encounter, and it also permitted the parties to examine her.

67

## 2. *Prosecutorial and Judicial Misconduct*

Defendant contends that the prosecutor committed misconduct by referring to "Willie Horton"[16] during the penalty phase argument, and that the trial court also committed misconduct by failing to admonish the jury to disregard the remark.

During the penalty phase, Jack Horton, who had witnessed the attack on robbery victim Beatrice Thompson, testified about defendant's appearance during the attack. In his closing argument, in reference to Horton's testimony, the prosecutor stated, "You heard from Mr. Horton about jeri curls, but then what he saw, he said was jeri curls, I guess it is a matter of definition where the hair is really short. Even Willie Horton said he had on the hooded sweatshirt, the same type of garment, the same kind of — " At which point the trial court interjected, "You said Willie Horton." The prosecutor apologized, and continued with his argument.

The Attorney General contends this claim is forfeited because defendant failed to request that the trial court admonish the jury to disregard the remark. We agree. (See *People v. Stanley* (2006) 39 Cal.4th 913, 952.) In any event, this claim lacks merit. The context of the prosecutor's singular use of "Willie Horton" indicates he misspoke, and was not referring to defendant or otherwise attempting to associate defendant with Willie Horton. When corrected by the court, the prosecutor apologized, and there is nothing in the record to suggest the prosecutor's remark was intentional.

---

[16] Willie Horton was an inmate who committed a murder while on a prison furlough program supported by then Massachusetts Governor Michael Dukakis; Dukakis's support of the program was an issue raised during the 1988 presidential election. (See *Arizona Right to Life Political Action Com. v. Bayless* (9th Cir. 2003) 320 F.3d 1002, 1004 & fn. 3; *Del Vecchio v. Illinois Dept. of Corrections* (7th Cir. 1994) 31 F.3d 1363, 1399, fn. 1 (en banc) (dis. opn. of Ripple, J.).)

### D. Constitutional Challenges to the Death Penalty

Defendant makes numerous constitutional challenges to California's death penalty scheme, but acknowledges we have previously rejected these challenges.

The trial court need not instruct jurors that (1) they should presume life imprisonment without the possibility of parole is the appropriate sentence; and (2) their findings regarding aggravating factors must be unanimous. (*Valdez*, *supra*, 55 Cal.4th at pp. 179-180, and cases cited therein.) The absence of intercase proportionality review is not unconstitutional. (*Ibid*.) "California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty. [Citations.] [¶] . . . [¶] The death penalty statute is not unconstitutional because it does not require 'findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation.] Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects that conclusion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 443.)

### E. Cumulative Error

Defendant contends the errors he alleges cumulatively amounted to reversible error. To the extent there are instances in which we have found error or assumed its existence, no prejudice resulted. We reach the same conclusion after considering their cumulative effect.

## III. Conclusion

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.

**CONCURRING OPINION BY KENNARD, J.**


A race-based peremptory challenge of a prospective juror is unlawful. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).) That rule was violated, defendant here asserts, when the prosecutor peremptorily challenged two Black prospective jurors. The trial court found that defendant had not made a prima facie showing that the two challenges were based on race; the prosecutor then declined the court's invitation to state his reasons for the challenges. In upholding the trial court's ruling, a majority of this court relies on race-neutral reasons that are apparent from the record. So do I. I perceive no inconsistency with the views expressed in my dissenting opinion in *People v. Johnson* (2003) 30 Cal.4th 1302, as I explain below.

**I**

Defendant, who is Black, was charged with robbing, raping, and murdering a White college student in her apartment in Bakersfield, Kern County. At defendant's first trial, the jury was unable to reach a verdict on those charges, as the sole Black juror, disagreeing with the other jurors, voted for an acquittal. Before retrial, defendant moved unsuccessfully for a change of venue. The supporting evidence included a poll finding that Blacks in Kern County were far less likely than Whites to believe that defendant was guilty of the charged offenses and to believe he should be executed if convicted.

1

On retrial, the venire contained only three Black prospective jurors (H.C., K.P.,[1] and B.M.).  Defendant made a *Batson* motion when the prosecutor used peremptory challenges against H.C. and K.P., at a time when B.M. had not yet been called.  The trial court denied the motion, ruling that defendant had not made a prima facie showing that the challenges were based on race.  The prosecutor then declined the court's invitation to give his reasons for the challenges.  Later, B.M. (a correctional officer) was called; neither party challenged her and she served on the jury, which convicted defendant of murder, found that the murder occurred in the commission of rape and robbery, and returned a verdict of death.

## II

In *Batson*, *supra*, 476 U.S. 79, the United States Supreme Court set forth a three-stage process for a trial court's evaluation of a claim that a peremptory challenge to a prospective juror was based on race:  (1)  The party objecting to the challenge must make a prima facie showing that the challenge was racially based; (2) the party that made the challenge must explain it; (3) the trial court then decides whether the challenge was, more likely than not, racially based.  Here, the second and third steps did not occur because the trial court ruled at the first stage that defendant had not made the requisite prima facie showing.  Was the trial court's ruling right or wrong?  That is the issue here; its resolution calls for a rather detailed discussion of two decisions, both arising from the same case: *People v. Johnson*, *supra*, 30 Cal.4th 1302, followed by *Johnson v. California* (2005) 545 U.S. 162.

Johnson was a Black defendant charged with murdering his White girlfriend's infant daughter.  The prosecutor exercised peremptory challenges

---

**1**      Although K.P. described herself as being of "mixed race," defense counsel, without disagreement from the prosecutor, described K.P. as Black in appearance.

2

against each of the three Black prospective jurors on the panel.  The trial court denied Johnson's *Batson* motion, ruling that he had failed to make a prima facie showing that the peremptory challenges were race based.  A majority of this court upheld the trial court's ruling; the majority reasoned that to make a prima facie showing that a peremptory challenge was based on "impermissible group bias" (including race), the party objecting to the challenge must show it was "more likely than not" that the challenge was based on such impermissible grounds. (*People v. Johnson*, *supra*, 30 Cal.4th at p. 1306.).

I dissented in *People v. Johnson.*  I disagreed both with the majority's "more likely than not" standard and with its holding that the defendant had not made a prima facie showing that the peremptory challenges had race-based reasons.  I said:  "The threshold for establishing a prima facie case should be relatively low, so that close cases are not decided at the first stage of the inquiry, but only after the trial judge has heard the prosecutor's explanations . . . ." (*People v. Johnson*, *supra*, 30 Cal.4th at p. 1339 (dis. opn. of Kennard, J.).)  I concluded that a prima facie case of race-based peremptory challenges arises from "those actions that, if unexplained, permit a reasonable inference of an improper purpose or motive."  (*Ibid*., italics omitted.)

My dissent in *People v. Johnson* then addressed this question, of pertinence here:  In concluding that a defendant objecting to a peremptory challenge did not make the required prima facie showing, may a court (as the majority does here) consider possible race-neutral reasons for the challenge that were not stated by the prosecutor?  I said:  "[I]f it is *apparent* that the prosecutor had neutral reasons for the challenges, then the pattern of challenges would not give rise to an inference of discriminatory purpose.  In such cases the trial court need not find a prima facie case.  [Citations]  But that rule should not apply when the trial court can only *speculate* on the basis for the challenges."  (*People v. Johnson*, *supra*, 30 Cal.4th

3

at p. 1340 (dis. opn. of Kennard, J.), italics added.)  With respect to two of the three challenged Black prospective jurors, "nothing in their oral or written responses . . . stands out to show they would be unacceptable" to the prosecution. (*Ibid.*)  Because "the pattern of prosecution challenges [to each of the three Black jurors] . . . created a reasonable inference of discriminatory purpose" (*ibid.*), and there were no obvious "neutral explanations for the challenges" (*ibid.*), I concluded that the trial court erred in ruling that defendant Johnson had not made a prima facie showing that the prosecutor's peremptory challenges were based on race (*id.* at p. 1341).

The United States Supreme Court granted defendant Johnson's petition for certiorari and reversed.  As I had done in my dissenting opinion in *People v. Johnson*, *supra*, 30 Cal.4th 1302, the high court in *Johnson v. California* rejected this court's "more likely than not" standard to establish a prima facie showing.  Rather, a prima facie showing can be made "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California*, *supra*, 545 U.S. at p. 170.)  On the facts of the case before it, the high court said, such an inference could be drawn because the case involved a Black defendant charged with killing his White girlfriend's child, and the prosecutor challenged the only three Black prospective jurors on the panel. (*Id*. at p. 173.)

With respect to a court's consideration, at the prima facie stage, of possible race-neutral reasons for a peremptory challenge, the high court in *Johnson v. California* cautioned trial courts against "engaging in needless and imperfect speculation [about the reasons for a challenge] when a direct answer can be obtained by asking a simple question." (*Johnson v. California*, *supra*, 545 U.S. at p. 172; see also p. 173.)  The high court expressed no view on a point I had made in my dissent in *People v. Johnson*, which is this:  A court may find no prima facie

4

showing of discrimination when it is "*apparent* that the prosecutor had neutral reasons for the challenges." (*People v. Johnson*, *supra*, 30 Cal.4th at p. 1340, italics added.) When the record demonstrates race-neutral grounds that are obvious, rather than merely speculative, consideration of such grounds is consistent with the high court's decision in *Batson* that courts "should consider all relevant circumstances" (*Batson*, *supra*, 476 U.S. at p. 96) in determining whether a reasonable inference arises that a peremptory challenge was based on race.

Unlike the responses by the three Black prospective jurors peremptorily challenged by the prosecutor in *People v. Johnson*, here certain responses by prospective jurors K.P. and H.C. "stand[] out to show they would be unacceptable" to the prosecution (*People v. Johnson*, *supra*, 30 Cal.4th at p. 1340 (dis. opn. of Kennard, J.)). In that situation, my dissent in *People v. Johnson* said, "the pattern of challenges [does] not give rise to an inference of discriminatory purpose[, and] the trial court need not find a prima facie case." (*Ibid.*)

Prospective juror K.P. testified on voir dire that her brother was facing a felony charge in Kern County Juvenile Court for selling drugs. Thus, *at the time of defendant's trial here*, a member of K.P.'s immediate family was being prosecuted by the same office that was prosecuting defendant. Therefore, the prosecutor here had an obvious race-neutral reason for the peremptory challenge — the ongoing adversarial relationship between a member of K.P.'s immediate family and the prosecutor's office.

As to prospective juror H.C., he said "yes" to this question: "Would the fact that [defendant] is African-America[n] make it more difficult for you to consider all the facts in the case objectively than if he were not a Black man?" This response indicated that defendant's race could cause H.C. to be biased in favor of defendant and therefore against the prosecution, an obvious race-neutral reason for challenging him.

5

Justice Liu's concurring opinion notes that the two challenged Black jurors "were strong supporters of the death penalty, and both gave clear answers suggesting that they would be willing and able to impose it." (Conc. opn. of Liu, J., *post*, p. 13.) But in a capital case, a prospective juror's support for the death penalty *in the abstract* is not the prosecution's only concern. Given the nature of our adversary system, the prosecution understandably prefers jurors who are more likely to vote for guilt and for the death penalty *in the case being tried*. Here, it is doubtful that prospective jurors K.P. and H.C. would be so inclined, in light of their statements. (See p. 5, *ante*.)

I now consider another point in Justice Liu's concurrence: When, as here, a reviewing court discerns from the record that a peremptory challenge is supported by a race-neutral reason not stated by the prosecutor, should the court also consider whether that reason "applied equally to other jurors" not challenged by the prosecutor? (Conc. opn. of Liu, J., *post*, p. 18.) As Justice Liu explains, consideration of such information flows logically from the United States Supreme Court's statement that, in determining whether a party has made a prima facie case that the opposing party has challenged a prospective juror because of race, a court should consider "all relevant circumstances." (*Batson*, *supra*, 476 U.S. at pp. 96-97.) But in that situation, this court has noted in past decisions that it would not engage in comparative juror analysis. (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 225–226 & fn. 5; *People v. Clark* (2011) 52 Cal.4th 856, 907–908 & fn. 13; *People v. Bonilla* (2007) 41 Cal.4th 313, 343, 347–350.) I joined those decisions. I am now persuaded, however, that circumstances pertaining to other jurors can be relevant in this context. What comes to mind in this change of view are the oft-quoted words of United States Supreme Court Justice Felix Frankfurter: "Wisdom too often never comes, and so one ought not to reject it merely because

6

it comes late." (*Henslee v. Union Planters Nat. Bank & Trust Co.* (1949) 335 U.S. 595, 600 (dis. opn. of Frankfurter, J.).)

Applying comparative juror analysis here, however, does not alter my view that defendant failed to establish a prima facie case of racially motivated peremptory challenges. The readily apparent race-neutral reasons for the prosecutor's peremptory challenges of prospective jurors H.C. and K.P. do not apply to any other jurors not challenged by the prosecution. Unlike prospective juror H.C., no alternate or sitting juror said that defendant's race would make it more difficult for the juror to look objectively at all of the facts. And unlike prospective juror K.P., no alternate or sitting juror had, at the time of trial, an immediate family member being prosecuted by the same office that was prosecuting defendant.

For the reasons stated above, I join the majority in rejecting defendant's claim that the prosecutor's peremptory challenges of two prospective jurors were based on race.


KENNARD, J.


7

**CONCURRING OPINION BY LIU, J.**

Defendant, a black man, was charged with raping and murdering a young white woman in Kern County. Defendant's first trial resulted in a hung jury that divided 11 to 1 in favor of guilt. The holdout juror was the lone African American on the jury. Before retrial, the defense moved for a change of venue, presenting survey results showing that black residents of the county were significantly less likely than white or other residents to prejudge defendant as guilty or to prejudge that his crime merited the death penalty if he was found guilty. The motion was denied.

In selecting the second jury, the prosecutor used peremptory challenges to excuse the first two black prospective jurors seated in the jury box. Defendant objected, claiming that the prosecutor struck these jurors on the basis of race. The trial court concluded that defendant had not made a prima facie showing of discrimination and that the prosecutor was therefore not required to explain these strikes. The trial court nevertheless invited the prosecutor to state his reasons for the strikes, but the prosecutor declined. Ultimately, the jury that convicted defendant and sentenced him to death consisted of 10 white jurors, one Hispanic juror, and one black juror.

Today's opinion holds that defendant failed to make a prima facie showing of a *Batson* violation. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).) It concludes that the circumstances of this case do not "raise an inference that the

1

prosecutor excluded a prospective juror based on race." (Maj. opn., *ante*, at p. 35.) This questionable result is compelled by our precedent, and for that reason, I join the court in rejecting defendant's *Batson* claim.

I write separately, however, to observe that our *Batson* jurisprudence on what is required to show a prima facie case of discrimination, including our decision in the present case, appears noticeably out of step with principles set forth by the United States Supreme Court in two crucial respects. First, by scouring the record for nonobvious reasons that might explain the peremptory strike of a minority juror, and by relying on such reasons to negate the inference of discrimination otherwise arising from the circumstances, this court has improperly elevated the standard for establishing a prima facie case beyond the showing that the high court has deemed sufficient to trigger a prosecutor's obligation to state the actual reasons for the strike. Second, while regularly invoking nonobvious reasons that a prosecutor might have given for striking a minority prospective juror, this court has erroneously prohibited the use of comparative juror analysis to test whether a hypothesized reason was likely the actual reason for a particular strike. Such a prohibition, which today's opinion restates and does not disavow, precludes reviewing courts from considering all relevant circumstances bearing on a claim of discrimination.

Both infirmities threaten *Batson*'s vitality by improperly restricting a party's ability to probe peremptory challenges that may be unconstitutionally discriminatory. As the high court has emphasized, "racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' [citation], and places the fairness of a criminal proceeding in doubt." (*Powers v. Ohio* (1991) 499 U.S. 400, 411 (*Powers*).) Such discrimination harms not only the accused. "A venireperson excluded from jury service because of race suffers a profound personal humiliation" (*id.* at p. 413) and loses "a significant opportunity

2

to participate in civic life" (*id.* at p. 409). Further, "the entire community" has a strong interest in the fairness of our courts. (*Batson*, *supra*, 476 U.S. at p. 87.) Whereas the *Batson* inquiry seeks to ensure that a prosecutor's actual reasons for a peremptory strike are not discriminatory, this court's unduly narrow understanding of what constitutes a prima facie case of discrimination serves to excuse trial courts from asking, and to excuse prosecutors from stating, the actual reasons for striking a minority juror. A jurisprudence of "don't ask, don't tell" does not properly safeguard "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." (*Id.* at pp. 85–86.) Nor does it promote "public confidence in the fairness of our system of justice." (*Id.* at p. 87.)

The discussion that follows dovetails with concerns I have expressed about our *Batson* jurisprudence in another case filed today and in a third case decided earlier this term. (See *People v. Mai* (Aug. 26, 2013, S089478) __ Cal.4th __, __ (*Mai*) (conc. opn. of Liu, J.); *People v. Williams* (2013) 56 Cal.4th 630, 699 (*Williams*) (dis. opn. of Liu, J.).) A generation ago, *Batson* observed: "The reality of practice, amply reflected in many state- and federal-court opinions, shows that the [peremptory] challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice. In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race." (*Batson*, *supra*, 476 U.S. at p. 99, fn. omitted) The high court has echoed, extended, and amplified these concerns many times since. (See *Powers*, *supra*, 499 U.S. 400; *Edmonson v. Leesville Concrete Co.* (1991) 500 U.S. 614; *Georgia v. McCollum* (1992) 505 U.S. 42; *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127; *Miller-El v. Cockrell*

3

(2003) 537 U.S. 322; *Johnson v. California* (2005) 545 U.S. 162; *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Miller-El*); *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*).)

Yet consider this fact:  In adjudicating *Batson* claims in more than 100 cases over the past two decades, this court has found unlawful discrimination in jury selection only once — and that was a case more than 12 years ago in which the prosecutor struck all five Hispanic members of the venire and through his own words "revealed an acute sensitivity to the presence of Hispanics on the jury panel and an evident belief that Hispanics would not be favorable jurors for the prosecution."  (*People v. Silva* (2001) 25 Cal.4th 345, 375 (*Silva*).)  Like my colleagues, I am confident that California's prosecutors and trial judges take seriously their responsibility to avert racial discrimination in jury selection.  But one need not question the overall excellence and integrity of our prosecutors and trial courts in order to pause and wonder, in light of the remarkable uniformity of this court's *Batson* decisions over the past 20 years, whether we have maintained the proper level of vigilance.  Today, as when *Batson* was decided, it is a troubling reality, rooted in history and social context, that our black citizens are generally more skeptical about the fairness of our criminal justice system than other citizens.  Yet it is precisely to ensure public confidence in our courts and their verdicts that *Batson* "forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  (*Batson*, *supra*, 476 U.S. at p. 89.)  I have serious doubts as to whether our jurisprudence has held true to *Batson*'s mandate.

## I.

The Fourteenth Amendment to the United States Constitution prohibits a party from using peremptory challenges to strike a prospective juror because of his

4

or her race.  (See *Batson*, *supra*, 476 U.S. at p. 89.)  In *Batson*, the high court set forth a three-stage analysis to determine whether the prosecution has violated this mandate.  First, a defendant must establish a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  (*Id.* at p. 94.)  Second, once the defendant "makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging" the prospective jurors in question.  (*Id.* at p. 97.)  Finally, at the third stage, the court must consider the totality of relevant circumstances to determine whether it is more likely than not that the peremptory challenges were based on impermissible discrimination.  (*Id.* at p. 98.)

The present case involves *Batson*'s first-stage requirement that a defendant make a prima facie showing of discrimination.  *Batson* elucidated this requirement against the backdrop of *Swain v. Alabama* (1965) 380 U.S. 202, which a number of courts had interpreted to hold that a defendant could establish a prima facie case only with "proof of repeated striking of blacks over a number of cases."  (*Batson*, *supra*, 476 U.S. at p. 92.)  In *Batson*, the high court observed that this interpretation had "placed on defendants a crippling burden of proof" (*ibid.*), leaving "prosecutors' peremptory challenges . . . largely immune from constitutional scrutiny."  (*Id.* at pp. 92–93.)  *Batson* therefore "reject[ed] this evidentiary formulation" and instead established a less stringent standard for making a prima facie case.  (*Id.* at p. 93.)

According to *Batson,* "the defendant first must show that he is a member of a cognizable racial group, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  (*Batson*, *supra*, 476 U.S. at p. 96.)  Although the high court later held that a defendant need not share the race of the challenged juror in order to assert a *Batson* claim (see *Powers*, *supra*, 499 U.S. at p. 402), "[r]acial identity between

5

the defendant and the excused person . . . may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred" (*id.* at p. 416). "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " (*Batson*, at p. 96.) Finally, the defendant may point to "any other relevant circumstances" suggestive of discrimination, including "a 'pattern' of strikes against black jurors" and "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges." (*Id.* at pp. 96–97.) A defendant meets the burden of establishing a prima facie case if this "combination of factors" raises an "inference of purposeful discrimination." (*Id.* at p. 96.)

Prior to *Batson*, this court in *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), interpreting the California Constitution, adopted a similar three-stage framework for analyzing claims of racial discrimination in jury selection. *Wheeler*'s standard for establishing a prima facie case of discrimination required a defendant to show a "strong likelihood" of discrimination. (*Id.* at p. 280.) Some years later, this court in *People v. Johnson* (2003) 30 Cal.4th 1302 held that "[u]nder both *Wheeler* and *Batson*, to state a prima facie case, the objector must show that it is *more likely than not* the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*Id.* at p. 1306, italics added.) According to *People v. Johnson,* "when [the high court] refers to the objector establishing 'an inference of discriminatory purpose' (*Batson, supra,* 476 U.S. at p. 94), the high court means establishing a legally mandatory rebuttable presumption, and *not* merely presenting enough evidence to *permit the inference.*" (*Id.* at p. 1315.)

6

In *Johnson v. California*, *supra*, 545 U.S. 162, the United States Supreme Court reversed our decision in *People v. Johnson* and held that "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case" at *Batson*'s first stage. (*Id.* at p. 168.) The high court explained: "[W]e assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170.) The high court further observed that setting a low threshold for establishing a prima facie case is fully consistent with *Batson*'s purposes: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Id.* at p. 172.)

The high court then applied the *Batson* first-stage inquiry to the facts before it. The defendant, who was black, had been convicted of murdering his white girlfriend's 19-month-old child. (*Johnson v. California*, *supra*, 545 U.S. at p. 164.) The prosecution had used three peremptory challenges to strike all three of the black prospective jurors on the panel. When the defense objected, the trial judge did not seek an explanation from the prosecutor. Instead, the trial judge

7

"explained that her own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons. Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires." (*Id.* at p. 165.) On appeal, this court affirmed the trial court's ruling but "acknowledged that the case involved the 'highly relevant' circumstance that a black defendant was 'charged with killing "his White girlfriend's child," ' and that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' [Citation.]" (*Id.* at p. 167.)

The high court, analyzing the issue in a brief paragraph, said that "the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close," ' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' [Citation.] Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson*." (*Johnson v. California*, *supra*, 545 U.S. at p. 173.) In reaching this holding, the high court — though aware that the trial judge's "own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons," i.e., "the black venire members had offered equivocal or confused answers in their written questionnaires" (*id.* at p. 165) — assigned no weight to this consideration and instead warned against "the imprecision of relying on judicial speculation to resolve plausible claims of discrimination" (*id.* at p. 173).

## II.

Since *Johnson v. California*, this court has described the burden that a defendant must meet at *Batson*'s first step in accordance with the high court's clarification of that standard. (See maj. opn., *ante*, at pp. 33, 35; *People v.*

8

*Lancaster* (2007) 41 Cal.4th 50, 74 ["A defendant establishes a prima facie case of discrimination 'by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson* [*v. California*], *supra*, 545 U.S. at p. 170.)"].) This court has also declined to accord deference to a trial court's determination that a defendant failed to establish a prima facie case when the trial court may have applied the "strong likelihood" or "more likely than not" standard disapproved by the high court. (See *People v. Bell* (2007) 40 Cal.4th 582, 597 ["Where it is unclear whether the trial court applied the correct standard, we review the record independently to 'apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis."]; *People v. Pearson* (2013) 56 Cal.4th 393, 421; *People v. Carasi* (2008) 44 Cal.4th 1263, 1293.) Today's opinion properly follows this approach. (Maj. opn., *ante*, at p. 35.)

Nevertheless, while correctly stating the *Johnson v. California* standard, this court has found no prima facie case in a variety of circumstances that seem clearly adequate to raise an inference of discrimination, including circumstances not very different from those in *Johnson v. California*. In such cases, including the one now before us, we have reached that result by invoking possible, but not obvious, reasons that a prosecutor might have given — but did not actually give — for striking a minority juror in order to negate an inference of discrimination that would otherwise arise from the circumstances. In so doing, our *Batson* step one jurisprudence commits the very mistake that *Johnson v. California* warned against: we routinely and erroneously "rely[] on judicial speculation to resolve plausible claims of discrimination." (*Johnson v. California*, *supra*, 545 U.S. at p. 173.)

Moreover, our cases employ judicial speculation in a conspicuously lopsided way. When hypothesizing race-neutral characteristics that might explain

9

the strike of a particular juror, we have categorically barred inquiry into whether those characteristics apply not only to the juror who was struck but also to one or more jurors who were not struck, even though such comparison clearly informs the explanatory power of any hypothesized reason for a strike. This runs afoul of the high court's instruction that "[i]n deciding whether the defendant has made the requisite showing" at *Batson*'s first step, courts "should consider *all relevant circumstances*." (*Batson*, *supra*, 476 U.S. at pp. 96–97, italics added.)

The upshot is that our application of *Johnson v. California*'s standard for establishing a prima facie case of discrimination prematurely cuts off inquiry into the prosecutor's actual motivations. In this case and others, our approach at *Batson*'s first step authorizes "needless and imperfect speculation when a direct answer can be obtained by asking a simple question," thereby undermining the *Batson* framework's objective "to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." (*Johnson v. California*, *supra*, 545 U.S. at p. 172.)

**A.**

In the present case, the prosecutor struck the first two black prospective jurors who were available for challenge. Ultimately, a third black prospective juror, who worked as a correctional officer, was permitted to serve on the jury. Given the small number of black jurors, I agree that the prosecutor's strikes of two black jurors did not amount to a pattern that conclusively raises an inference of discrimination. (Maj. opn., *ante*, at p. 36.) At the same time, I note that the numbers here — two out of two black prospective jurors were struck at the time of defendant's *Batson* motion, and ultimately two out of three were struck — are not so dissimilar from the three-out-of-three pattern that the high court in *Johnson v. California* considered virtually dispositive. (*Johnson v. California*, *supra*, 545 U.S. at p. 172.)

10

A " 'pattern' " of strikes against prospective jurors of a particular race is only one "example" of the "relevant circumstances" that must be considered in determining whether a defendant has established a prima facie case. (*Batson*, *supra*, 476 U.S. at pp. 96–97; see *Snyder*, *supra*, 552 U.S. at p. 478 [striking even one juror on the basis of race violates the federal Constitution]; *People v. Montiel* (1993) 5 Cal.4th 877, 909 [same].) Here, there are several additional circumstances that, when considered together with the prosecution's strikes of the first two black panelists available for challenge, are easily sufficient to raise an inference of discrimination.

First, defendant was a black man who was accused of raping and murdering a young white woman. As the court acknowledges, " '[T]he social, racial and sexual overtones [of the case] were precisely the kind which could "most effectively prejudice" defendant.' " (Maj. opn., *ante*, at p. 27.) In such a case, a prosecutor's exercise of peremptory challenges against prospective jurors of the defendant's race may be especially suggestive of a racial motivation. (See *Powers*, *supra*, 499 U.S. at p. 416 ["Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred."]; *People v. Johnson*, *supra*, 30 Cal.4th at p. 1326 [the fact that "this case involves an African-American defendant charged with killing 'his White girlfriend's child' " is "obviously highly relevant to whether a prima facie case existed" where prosecutor struck three black jurors]; *Wheeler*, *supra*, 22 Cal.3d at p. 281 ["the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the

11

remaining jurors belong, these facts may also be called to the court's attention"]; *Madison v. Commissioner* (11th Cir. 2012) 677 F.3d 1333, 1337 ["relevant circumstances . . . include 'the subject matter of the case . . . if it is racially or ethnically sensitive' "].)

Second, the prosecutor was aware of specific facts that might have led him to believe the racially sensitive nature of this case would cause a juror's race to be particularly salient. Before jury selection, as part of its motion for change of venue, the defense submitted a survey of Kern County residents conducted by an expert. The survey revealed that 16.7 percent of African Americans, in contrast to 57.5 percent of members of other races, prejudged defendant as guilty. The same survey also reported that 11.1 percent of African Americans, in contrast to 47.3 percent of members of other races, believed the death penalty would be the appropriate punishment if defendant were found guilty.

Even more concrete evidence of such racial division was the fact that the single juror who had refused to convict defendant of the rape and murder charges in the first trial was the sole African American on the jury. As defense counsel argued in making his *Batson* motion, this fact raised the concern that the prosecutor was "excusing African Americans on their race because he feels that they will not vote guilty this time." Acting on such presumptions is precisely what *Batson* prohibits: the prosecution cannot "strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." (*Batson*, *supra*, 476 U.S. at p. 97.) In light of the facts known to the prosecutor, the strikes of the first two black prospective jurors available for challenge at least called for an explanation.

Finally, the two black jurors whom the prosecutor struck were strong supporters of the death penalty, and both gave clear answers suggesting that they would be willing and able to impose it. H.C. indicated on his questionnaire that

the death penalty was used "too seldom," and he repeatedly and unequivocally affirmed during voir dire that he could vote for it. When the prosecutor asked K.P. if she could "actually vote to return a verdict of death," K.P. responded: "[I]f I believed he was guilty and . . . weighed all the options and all that and that's what I thought, then I would have no problem voting that."

Under *Johnson v. California*, the totality of these circumstances is more than adequate to raise an inference of discrimination.

**B.**

In reaching a contrary conclusion, today's opinion hypothesizes various explanations that the prosecutor could have offered for striking these two prospective jurors. The court observes that H.C. worked at the university and knew eight potential witnesses in the case. The court also notes several responses H.C. gave on his juror questionnaire that might have caused concern for the prosecutor, including one answer indicating that defendant's race would make it more difficult for H.C. to consider the facts objectively. As for K.P., the court observes that her brother had been arrested for selling marijuana and that the case was pending in Kern County juvenile court at the time of defendant's trial. The court also notes that K.P. said jury service would force her to drop some summer school classes, potentially interfering with her ability to transfer to a four-year college. (See maj. opn., *ante*, at pp. 36–37.)

The court's reliance on these hypothesized reasons to negate the inference of discrimination otherwise arising from the circumstances reveals two related errors in our application of *Batson*'s first-stage inquiry.

**1.**

First, the mere fact that a court can find *possible* race-neutral reasons in the record for a prosecutor's strikes does not negate an inference of discrimination at *Batson*'s first step. The high court recognized this principle in *Johnson v.*

13

*California* itself. In contrast to our opinion today, the high court in *Johnson v. California* declined to engage in any speculation as to possible reasons for the prosecutor's strikes, even though it was aware that the trial judge's "own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons. Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires." (*Johnson v. California*, *supra*, 545 U.S. at p. 165.) Instead, the high court found an inference of discrimination at *Batson*'s first step based on the fact that the prosecutor struck all three black prospective jurors in a case where a black defendant was charged with killing his white girlfriend's child — full stop.

Because it is all too easy to comb the record and find some legitimate reason the prosecution could have had for striking a minority juror, dispelling an inference of discrimination otherwise arising from the totality of circumstances "requires more than a determination that the record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges." (*Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110.) Of course, there may be circumstances where the explanation for a prosecutor's strike of a particular juror is so obvious that there is little or no reason to think anything else could have motivated the strike. (See, e.g., *People v. Jones* (Aug. 26, 2013, S042346) __Cal.4th __, __ [p. 3] (conc. opn. of Liu, J.) ["[The struck juror] was married to a convicted murderer. None of the seated or alternate jurors had anything remotely similar in their backgrounds."].) In such cases, trial courts need not and should not subject prosecutors to idle inquiry; they may swiftly and justifiably reject "a spurious claim interposed simply for purposes of harassment or delay." (*Wheeler*, *supra*, 22 Cal.3d at p. 281.) However, "[i]n light of [*Johnson v. California*], an inquiry into apparent reasons is relevant only insofar as the strikes are so clearly attributable to that apparent, non-discriminatory reason that there is no longer any

14

suspicion, or inference, of discrimination in those strikes." (*United States v. Stephens* (7th Cir. 2005) 421 F.3d 503, 516.)  As noted earlier, "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.  [Citation.]  The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson v. California*, 545 U.S. at p. 172; see *ibid.* [" '[I]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken.' "].)  Where, as here, the record reveals only possible but not obvious reasons for a strike, reliance on such reasons to reject a *Batson* claim at the first step effectively short-circuits the three-step framework and defeats the essential inquiry into whether the *possible* reasons for a strike were the prosecutor's *actual* reasons.

Justice Kennard, writing separately, contends that the pending charge in Kern County juvenile court against K.P.'s brother and H.C.'s indication on his juror questionnaire that defendant's race would make it more difficult for him to consider the facts objectively were "obvious" race-neutral reasons for the prosecutor's strikes. (Conc. opn. of Kennard, J., *ante*, at p. 5.)  It is telling, however, that no other member of the court claims that these reasons, or any others, were "obvious" — and for good reason.  During voir dire, the prosecutor asked H.C.: "[I]f you hear the evidence and you're persuaded that the defendant committed one or more of the crimes charged against him, would you hesitate to find him guilty because of his ethnic background?"  H.C. answered:  "No."  And elsewhere on H.C.'s questionnaire, H.C. checked "Yes" in response to the question:  "If it were to develop in this case that the testimony of black witnesses contradicts the testimony of white witnesses, all other things being equal, would you be able [to] give equal credit to both?"  These responses tend to mitigate any

15

concern the prosecutor might have had about H.C.'s ability to consider the facts objectively in this case.  Of course, the prosecutor still could have had a genuine concern about H.C.'s objectivity.  But any such concern was not so obvious as to eliminate the need for the prosecutor to state his actual concern on the record.

As for K.P., the pending charge against her brother, considered in isolation, may appear to explain the prosecutor's strike.  But it is a far less obvious explanation when one realizes that no fewer than *six* seated jurors — five white and one Hispanic — each disclosed a similar negative association with the criminal justice system.  (See *post*, at pp. 20–24.)  At *Batson*'s first stage, "reliance on common juror characteristics that could explain the prosecution's peremptories 'risk[s] collapsing all three of *Batson*'s steps into the prima facie inquiry.' " (*Bennett v. Gaetz* (7th Cir. 2010) 592 F.3d 786, 792 (*Bennett*).)  Again, it may be that the pending charge against K.P.'s brother was actually why the prosecutor struck K.P.  But it is far from obvious, given what we know about several jurors whom the prosecutor did not strike.

**2.**

I will elaborate in a moment the comparative juror analysis relevant to K.P.  As a preface to that discussion, it is important to note the second error in our first-stage *Batson* jurisprudence that today's opinion perpetuates:  This court categorically rejects the relevance of  comparative juror analysis at *Batson*'s first step.  Today's opinion restates our rule:  "When a trial court has found no prima facie showing, and the prosecutor has declined to state his reasons for the excusals, we have declined to conduct a comparative juror analysis.  [Citation.]" (Maj. opn., *ante*, at p. 37.)  This rule is flatly inconsistent with our obligation to consider "all relevant circumstances" in deciding whether a defendant has made a prima facie case of discrimination.  (*Batson*, *supra*, 476 U.S. at pp. 96–97.)

16

Comparative juror analysis involves determining whether a race-neutral reason that a party might have had for striking a prospective juror also applies to one or more prospective jurors whom the party did not strike. It is "one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix* (2008) 44 Cal.4th 602, 622 (*Lenix*).) As the high court has explained: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El*, *supra*, 545 U.S. at p. 241.) By the same logic, if a court's hypothesized reason for a prosecutor's strike of a black panelist "applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered" at *Batson*'s first step. (*Ibid.*)

Before the high court's decisions in *Miller-El* and *Snyder*, this court had refused to conduct comparative juror analysis for the first time on appeal at either *Batson*'s first or third stage, holding such an inquiry to be "unreliable and inconsistent with the deference reviewing courts necessarily give to trial courts." (*People v. Johnson*, *supra*, 30 Cal.4th at p. 1318.) *Miller-El* and *Snyder* engaged in extensive comparative juror analysis at *Batson*'s third stage in the course of deciding that the defendants in those cases had proven racial discrimination. (See *Miller-El*, *supra*, 545 U.S. at pp. 241–252; *Snyder*, *supra*, 552 U.S. at pp. 483– 485.) In light of those decisions, we now engage in comparative juror analysis at *Batson*'s third stage even if the analysis was not conducted below. (*Lenix*, *supra*, 44 Cal.4th at p. 607.)

At *Batson*'s first stage, however, this court continues to resist comparative juror analysis on the theory that such analysis "has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales." (*People*

17

*v. Bonilla* (2007) 41 Cal.4th 313, 350 (*Bonilla*).) Even when a court hypothesizes reasons that the prosecution might have given for striking a juror, our precedent has consistently held that it is unnecessary and inappropriate to compare the struck juror with other jurors to see whether the hypothetical reasons might also have applied to them. (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 225–226 & fn. 5; *People v. Clark* (2011) 52 Cal.4th 856, 907–908 & fn. 13 (*Clark*); *People v. Hawthorne* (2009) 46 Cal.4th 67, 80, fn. 3; *Bonilla*, at pp. 343, 347–350.)

Our prohibition on comparative juror analysis at *Batson*'s first stage is contrary to clearly established law. *Batson* made clear that in determining whether a defendant has made a prima facie case, a court must consider "all relevant circumstances." (*Batson*, *supra*, 476 U.S. at pp. 96–97.) If a court hypothesizes race-neutral reasons the prosecution might have given for striking a particular juror, isn't it relevant to inquire whether those reasons applied equally to other jurors? Comparative juror analysis tests whether a proffered reason for striking a juror is likely to have been the actual reason for the strike. (See *Miller-El*, *supra*, 545 U.S. at p. 241; *Lenix*, *supra*, 44 Cal.4th at p. 618, fn. 13.) Such comparison is equally relevant whether the reason was proffered by the prosecution for examination at *Batson*'s third stage or whether the reason was proffered by the trial court, by the Attorney General, or by this court for consideration at *Batson*'s first stage.

This approach, dictated by logic and fairness, is not novel. Many courts have recognized the relevance of comparative juror analysis at *Batson*'s first stage. (See, e.g., *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, 1149 ["[B]ecause comparative juror analysis assists a court in determining whether the totality of the circumstances gives rise to an inference of discrimination, we believe that this analysis is called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the *Batson* analysis."];

18

*People v. Davis* (Ill. 2008) 899 N.E.2d 238, 246 ["We see no reason why a comparative juror analysis would not also be a relevant factor in the totality of factors that must be considered in determining whether a *prima facie* case exists in the first instance."]; *Bennett*, *supra*, 592 F.3d at p. 792 ["[T]he jurors' experience with crime seems an implausible reason for the peremptories. Although the two African-Americans struck by the prosecution testified that they had been crime victims, so too did at least four non-African-Americans who ultimately served as jurors."]; *United States v. Hughes* (8th Cir. 1989) 880 F.2d 101, 103; *State v. Rhone* (Wash. 2010) 229 P.3d 752, 757; *Keeton v. State* (Tex.Crim.App. 1988) 749 S.W.2d 861, 867–868; *Ex parte Branch* (Ala. 1987) 526 So.2d 609, 623.)

As noted, today's opinion restates and does not disavow this court's prohibition on comparative juror analysis at *Batson*'s first step. (Maj. opn., *ante*, at p. 37.) But the court then proceeds to conduct an analysis purporting to show that its hypothesized reasons for the prosecutor's strikes of H.C. and K.P. do not apply to other prospective jurors. (*Id.* at pp. 38–40.) Since the court continues to adhere to the position that comparative juror analysis is irrelevant in first-stage *Batson* analysis, it is unclear why the court, for the first time in our case law, feels the need to undertake such analysis in this case — unless the court actually *does* recognize the relevance of comparative juror analysis, in which case the court should follow Justice Kennard's example and forthrightly declare a "change of view." (Conc. opn. of Kennard, J., *ante*, at p. 6.) In any event, whether or not the court in deed, if not in word, has signaled a retreat from its established rule, its rendition of comparative juror analysis does not dislodge the inference of discrimination in the present case.

Consider the two reasons that today's opinion hypothesizes for the prosecutor's strike of K.P. First, K.P.'s brother had been charged in Kern County juvenile court with selling marijuana, and the court says the prosecutor could have

19

been concerned that K.P. "might be biased against the prosecution and law enforcement agencies that were *currently* prosecuting her brother. (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 167, fn. 13 [family member's negative experience with the criminal justice system is a race-neutral reason for a peremptory challenge].)" (Maj. opn., *ante*, at p. 37.) But if "negative experience with the criminal justice system" was the concern, one might expect the prosecution to have been equally concerned about three seated jurors who had been convicted of misdemeanors in Kern County — one for misdemeanor assault and battery four years earlier, a second for drunk driving four years earlier, and a third for misdemeanor petty theft. A fourth seated juror had a best friend who had been convicted of a felony drug crime in Kern County two or three years earlier. A fifth had a brother who had been convicted of a misdemeanor about four years ago. And a sixth seated juror had a brother who had been convicted of child molestation and was currently in California state prison.

My colleagues observe that K.P., unlike the seated jurors, had an immediate family member "*currently*" being prosecuted by the same district attorney's office that was prosecuting defendant. (Maj. opn., *ante*, at p. 37; see *id.* at p. 39 ["Unlike K.P.'s brother's case, . . . none of these was *pending* in the very county where defendant was being tried."]; conc. opn. of Kennard, J., *ante*, at p. 7 [same].) The significance of this distinction eludes me. If anything, one might reasonably believe that jurors who had themselves been *convicted* or whose close friends or immediate family members had been *convicted* of crimes in Kern County would be equally if not more prone to bias against this district attorney's office than a juror whose brother had been charged *but not convicted*. Indeed, to support its hypothesis that the prosecutor struck K.P. because of the pending charge against her brother, the court cites *People v. Booker* (2011) 51 Cal.4th 141, a case where a black juror struck by the prosecution had a brother who had been *convicted* of

20

manslaughter. (*Id.* at p. 164; see maj. opn., *ante*, at p. 37.) Although the juror "felt the outcome was fair" (*People v. Booker*, at p. 164), it was in that context that we said "[a] negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge" (*id.* at p. 167, fn. 13). We have often held that a juror's prior criminal conviction is a fully legitimate and understandable reason for prosecutorial concern when rejecting a *Batson* claim. (See, e.g., *People v. Lomax* (2010) 49 Cal.4th 530, 575 [stricken juror had suffered a prior misdemeanor conviction for receiving stolen property]; *People v. Williams* (2006) 40 Cal.4th 287, 311 [stricken juror had suffered "two driving under the influence misdemeanor convictions prosecuted by the same office that was trying this case, one of which was approximately five years before the trial"].) Here, I do not see why the fact that six seated jurors had prior convictions, rather than pending charges, against themselves or their close friends or family members — and, in the case of at least three seated jurors, convictions obtained by the Kern County District Attorney's Office within the past four years — would have posed a lesser concern to the prosecutor than the pending, unadjudicated charge against K.P.'s brother.

Second, the court posits that serving as a juror would interfere with K.P.'s college education, as she would be forced to forgo taking summer school classes. (Maj. opn., *ante*, at p. 37.) The court speculates that the prosecutor could have concluded that K.P.'s "concerns about completing her education might impair her ability to focus on the case and serve as an impartial juror." (*Ibid.*) Of course, if having to drop summer school classes was a major detriment, K.P. would have been excused for hardship, but she was not. More to the point, other jurors complained of similar — and, in one case, very similar — hardships. One white seated juror was the sole manager of an American Legion post, and he was concerned he would be unable to find someone to replace him for the full length of

21

the trial. He would also be forced to miss a week-long Marine Corps League convention he had committed to attending, which, as the trial court observed, was "[o]bviously . . . something [he] would like to do." Another white seated juror raised almost precisely the same concerns as K.P.: she was also a college student and would also be forced to drop out of summer school classes for which she was then registered. When asked by the court if she would be able to take the same classes the next year, she said she was unsure. (Cf. *Snyder*, *supra*, 552 U.S. at pp. 483–484 [prosecution sought to explain the strike of a black panelist on the ground that serving as a juror would interfere with his student teaching obligations; high court rejected this explanation at *Batson*'s third stage, observing that two white jurors had disclosed comparable hardships].)

One could certainly attempt to draw distinctions between K.P. and the similarly situated nonblack jurors whom the prosecution did not strike. Perhaps the fact that K.P.'s brother was currently being prosecuted for a crime somehow caused the prosecutor to be marginally more concerned with K.P. than with the six seated jurors who had similar past experiences with the criminal justice system. Perhaps the prosecutor believed that dropping her summer school classes would be a particular distraction to K.P. because K.P. was also attempting to transfer to a four-year college, something the white seated juror who was forced to drop her summer school classes was not trying to do. Perhaps the prosecutor thought K.P.'s potential hardship was marginally greater than the potential hardship mentioned by the volunteer manager of the American Legion post. The court posits other speculative distinctions that the prosecutor might have found relevant and, for good measure, adds that "the *combination* of K.P.'s potential biases differentiated her from other prospective jurors." (Maj. opn., *ante*, at pp. 39–40, italics added.)

22

We can stipulate, as an inarguable fact, that no two jurors are ever exactly alike, and it is easy enough to concatenate various differences so as to individuate a particular juror. But the high court has never "announce[d] a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical [nonblack] juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Miller-El*, *supra*, 545 U.S. at p. 247, fn. 6.) Even assuming the distinctions above are significant (and I do not think they are), the need to posit such fine distinctions among prospective jurors reveals why comparative juror analysis is relevant and important at *Batson*'s first stage. *Batson*'s first step requires only a showing sufficient to permit an inference of discrimination, not proof that discrimination was more likely than not the reason for the strike. (*Johnson v. California*, *supra*, 545 U.S. at pp. 168–170.) The possible reasons a prosecutor might have given for striking a juror are not especially probative at *Batson*'s first stage unless they are truly obvious. The finer the distinction that must be drawn between a black juror who was struck and a nonblack juror who was not, the less likely it is that the purported distinction actually explains the strike. It is at least debatable whether the pending charge against K.P.'s brother was of greater concern to the prosecutor than the prior convictions suffered by six seated jurors or their close friends or family members. And it is at least debatable whether K.P.'s worry that jury service would interfere with her studies was of greater concern to the prosecutor than the similar worry expressed by the white college student who did not want to drop out of the summer school classes for which she had already registered. The first stage of the *Batson* inquiry is not the proper place to resolve these debatable points. The prosecutor may well have acted lawfully. But the totality of circumstances in this

23

case permits an inference of discrimination, and the trial court should have asked the prosecutor to state his reasons.

In sum, the purpose of the *Batson* inquiry is to ensure that the actual reasons for striking a minority juror are not discriminatory, not to invite courts to guess at possible reasons. Where, as here, the record discloses only possible but not obvious reasons for the strike of a minority juror, a court should not conclude on that basis — in the face of other circumstances suggestive of discrimination — that the defendant failed to establish a prima facie case. And in determining how likely or obvious it is that a hypothesized reason was the prosecutor's actual reason for the strike, a court must consider "all relevant circumstances" bearing on the prosecutor's motives, including comparative juror analysis. (*Batson*, *supra*, 476 U.S. at pp. 96–97; see *Miller-El*, *supra*, 545 U.S. at p. 252.) The court's first-stage *Batson* analysis in this case underscores "the imprecision of relying on judicial speculation to resolve plausible claims of discrimination." (*Johnson v. California*, *supra*, 545 U.S. at p. 173; see *Miller-El*, at p. 252 ["A *Batson* challenge does not call for a mere exercise in thinking up any rational basis."].) The court applies an unduly elevated standard for establishing a prima facie case of discrimination, collapsing a three-step analysis designed to elicit and evaluate the actual reasons for a prosecutor's strike into a one-step analysis designed to generate and validate judicially hypothesized reasons for the strike.

## III.

Notwithstanding the analysis above, my concurrence with today's judgment stems from a recognition that our decisions applying *Johnson v. California*, *supra*, 545 U.S. 162, have firmly settled on the erroneous approach that produces the erroneous result today, and the high court has not expounded any intervening law that supersedes or further explains the standards set forth in *Johnson v. California*. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1212–1213 [discussing stare

24

decisis]; *Alleyne v. United States* (2013) __ U.S. __, __ [133 S.Ct. 2151, 2164] (conc. opn. of Sotomayor, J.) [same]; cf. *Williams, supra*, 56 Cal.4th at p. 715 (dis. opn. of Liu, J.) [this court's rule of deference to trial court at *Batson*'s third step, adopted prior to *Miller-El* and *Snyder*, should be reconsidered in light of those decisions].) But the fact that our jurisprudence appears quite entrenched only heightens the need for a course correction by higher authority. Today's opinion adds to a pattern of decisions by this court that "engag[e] in needless and imperfect speculation" to defeat *Batson*'s objective of eliciting "actual answers to suspicions and inferences" of discrimination. (*Johnson v. California, supra*, 545 U.S. at p. 172.)

In *People v. Hoyos* (2007) 41 Cal.4th 872 (*Hoyos*), for example, this court found no inference of discrimination in a case where the defendant was Hispanic and the prosecution struck all three Hispanic female jurors while leaving one Hispanic man on the panel. (*Id.* at pp. 900–903.) The court correctly stated the *Johnson v. California* standard for *Batson*'s first-stage inquiry and, based on its own independent examination of the record, found possible race-neutral explanations for each of the three strikes against Hispanic female jurors. In one instance, "both the prosecutor and defendant's own counsel were reasonably concerned about the prospective juror's English language skills." (*Hoyos, supra*, 41 Cal.4th at p. 902.) In the other two instances, the reason was not so clear-cut. According to the court, during voir dire one juror, L.H., appeared "equivocal about the death penalty" and possibly "biased against it" (*id.* at p. 902); the other, Y.M., "had strong feelings against the death penalty" (*id.* at p. 903). But L.H. said "she could keep an open mind" (*id.* at p. 902), and Y.M. said "she could sit as a juror in this case" (*id.* at p. 903); in both cases, the trial court denied the prosecutor's challenge for cause. Without examining whether non-Hispanic female jurors whom the prosecutor did not strike had expressed similar reservations about the

25

death penalty, the court in *Hoyos* simply concluded that the prosecutor could have "had grounds for concern" about both jurors and therefore "was entitled to excuse" them. (*Id.* at p. 902.) The court nowhere acknowledged that in *Johnson v. California* the trial court's finding of " ' "grounds upon which the prosecutor might reasonably have challenged the jurors in question" ' " (*Hoyos*, at p. 900) played no role in the *Batson* step one analysis. (See *Johnson v. California*, *supra*, 545 U.S. at pp. 165, 173.)

In *Clark*, *supra*, 52 Cal.4th 856, the defendant, a black man, was charged with the murder and attempted rape of a 14-year-old white girl and with the kidnapping and attempted murder of a 15-year-old girl who was also white. (*Id.* at pp. 872–873.) During jury selection, the prosecution used peremptory challenges on four of the five black prospective jurors seated in the jury box. (*Id.* at pp. 904–905.) This court, upon independently reviewing the record, held that the defendant failed to establish a prima facie case. (*Id.* at pp. 904, 908.) The court observed that the prosecutor had not challenged two of these four black prospective jurors at his first opportunity to do so and had permitted the fifth and final black prospective juror to serve on the jury. (*Id.* at p. 906.) Further, according to *Clark*, the record suggested race-neutral reasons that the prosecutor might have had for excusing the four black prospective jurors. One was an administrative law judge, and another was a licensed pastoral counselor who led religious services for the homeless. (*Id.* at p. 907.) As to the other two jurors, the hypothesized reasons were not at all obvious. One "had taken college courses in psychology" and said during voir dire that murderers "must have 'something wrong with them in their mind' "; the other said during voir dire that "he had no problem with the death penalty but believed that facts could be manipulated and anyone could be 'hoodwinked' by corrupt attorneys." (*Ibid.*) Without inquiring whether any nonblack jurors whom the prosecutor did not strike had taken

26

psychology courses or harbored some distrust of attorneys, the court simply concluded that "the record fails to support an inference that the prosecutor excused the four jurors in question because of their race. Rather, the record reflects race-neutral grounds for the peremptory challenges at issue." (*Id.* at p. 908.)

Justice Kennard dissented from this holding in *Clark,* noting that "the prosecutor struck 'most or all of the members of the identified group from the venire' [citation]" after excusals for cause, that "the four challenged jurors shared only one characteristic, that of their race, and otherwise were 'as heterogeneous as the community as a whole' [citation]," and that the "defendant was 'a member of the excluded group' [citation] and the victims appear to have been members of 'the group to which the majority of the remaining jurors belong' [citation]." (*Clark*, *supra*, 52 Cal.4th at p. 1011 (conc. & dis. opn. of Kennard, J.).) These facts together, she observed, gave rise to an inference of discrimination at *Batson*'s first step. (*Id.* at pp. 1011–1012.)

In speculating on possible reasons for a prosecutor's strike, this court has not limited itself to possible reasons that appear in the record. In *People v. Hartsch* (2010) 49 Cal.4th 472 (*Hartsch*), the court found no prima facie case of discrimination where the prosecutor struck four of the first five, and five of the first seven, black panelists. (*Id.* at pp. 485–486.) The court observed that by the time the trial court heard the *Batson* motion, the prosecutor had accepted two black panelists: one "was employed as a school resource officer in a position 'akin to law enforcement' " (*id.* at p. 485), and the other "favored the death penalty" (*id.* at p. 487). The court also noted that "African-Americans were represented on the panel in a proportion roughly equal to their representation in the candidate pool" whereas whites were slightly underrepresented. (*Id.* at p. 488.) The court went on posit nonracial reasons appearing in the record that might have explained four of the five strikes against black jurors. (*Id.* at pp. 488–489.) But

27

the court undertook no comparative juror analysis to determine whether the hypothesized reasons, such as one black juror's purported "reluctance to resolve conflicts in the evidence and discomfort with scientific evidence" (*id.* at p. 488), applied to one or more nonblack jurors who were not struck.

A fifth black juror who was struck in *Hartsch* was "a supporter of the death penalty who believed it was imposed 'too seldom' " and "gave no responses in her questionnaire that would plainly appear to have given a prosecutor pause." (*Hartsch*, *supra*, 49 Cal.4th at p. 488.) The court acknowledged that "the objective factors supporting the challenge . . . are unclear." (*Id.* at p. 489, fn. 16.) "However," the court said, "the challenge of a single apparently qualified prospective juror does not suggest racial discrimination, 'particularly "given the legitimate role that subjective factors may have in a prosecutor's decision" to challenge or not challenge jurors peremptorily. [Citation.]' [Citation.] [¶] 'Myriad subtle nuances' not reflected on the record may shape an attorney's jury selection strategy, 'including attitude, attention, interest, body language, facial expression and eye contact.' [Citation.]" (*Ibid.*) In making these speculative assertions, the court in *Hartsch* did not mention the high court's admonition that " '[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (*Snyder*, *supra*, 552 U.S. at p. 478.) Nor did *Hartsch* mention that the high court in *Snyder* refused to credit a prosecutor's *actual* (much less hypothesized) reliance on a black juror's demeanor — in that case, "nervousness" — to explain a strike where the trial court had made no "specific finding on the record concerning [the juror's] demeanor." (*Snyder*, at p. 479.)

These precedents of our court stand in stark contrast to a substantial body of decisions by other courts that have found an inference of discrimination in circumstances less suggestive of racial discrimination than those present here. (See, e.g., *Crittenden v. Ayers* (9th Cir. 2010) 624 F.3d 943, 955–956 (*Crittenden*)

28

[prima facie case where prosecution struck the only black prospective juror, who appeared similar to two white jurors in many respects and whom the prosecution had tried to strike for cause on the basis of her general objections to the death penalty]; *United States v. Collins* (9th Cir. 2009) 551 F.3d 914, 921–923 (*Collins*) [prima facie case where prosecution struck the only black prospective juror, who was not questioned at length by the prosecution and appeared in general to be similarly situated to other jurors who were allowed to serve]; *United States v. Abdush-Shakur* (10th Cir. 2006) 465 F.3d 458, 470 ["Striking two out of three minority panel members . . . is sufficient to satisfy a defendant's prima facie *Batson* claim, especially when the jurors were apparently the only two stricken."]; *Heno v. Sprint/United Mgmt. Co.* (10th Cir. 2000) 208 F.3d 847, 854 ["Ms. Heno met her prima facie case by showing that Sprint used a peremptory to strike the only black juror on the panel."]; *Morse v. Hanks* (7th Cir. 1999) 172 F.3d 983, 985 [prima facie case where prosecution struck the only black venireman, voir dire was "perfunctory," and juror had not given "an answer that would expose a clear basis for the state to want to remove him"]; *United States v. Roan Eagle* (8th Cir. 1989) 867 F.2d 436, 441 [prima facie case where defendant was American Indian and prosecution struck the lone American-Indian panelist]; *United States v. Clemons* (3d Cir. 1988) 843 F.2d 741, 748 [finding a prima facie case "would clearly have been permissible" in case where defendant was black and prosecution struck both black panelists]; *State v. Hicks* (Wash. 2008) 181 P.3d 831, 838 [trial court judge acted "well within his discretion" in finding prima facie case where prosecution struck the sole black panelist, defendants were black, and prosecution engaged in only limited questioning of the struck juror]; *Highler v. State* (Ind. 2006) 854 N.E.2d 823, 827 [removal of the only African American on the panel " 'raise[s] an inference that the juror was excluded on the basis of race' "]; *Hollamon v. State* (Ark. 1993) 846 S.W.2d 663, 666 ["defendant must first

29

establish a prima facie case of purposeful discrimination, which the appellant clearly did in this case when he pointed to a peremptory strike by the state dismissing the sole black person on the jury"]; *People v. Hernandez* (N.Y. 1990) 552 N.E.2d 621, 623 ["The exercise of prosecutorial peremptory challenges to exclude the only [two] Latino jurors in the prosecution of a Latino defendant is enough . . . ."], affd. *sub nom. Hernandez v. New York* (1991) 500 U.S. 352; *State v. Walker* (Wis. 1990) 453 N.W.2d 127, 135 [prima facie case where defendant was black and prosecution struck the sole black panelist].)

Unlike our precedents, most of the cases above do not engage in speculation as to why a prosecutor might have struck a minority juror. In the few cases that do posit nonobvious reasons, such as a juror's views on the death penalty, the hypothesized reasons appeared in the record, and the court employed comparative juror analysis to test whether a hypothesized reason was likely the actual reason. (See *Crittenden*, *supra*, 624 F.3d at p. 956; *Collins*, *supra*, 551 F.3d at pp. 921–922.) All of the cases are united by an understanding that *Batson*'s first step is not meant to be particularly onerous because at that point it is "impossible for the defendant to know with certainty" all the relevant facts (*Johnson v. California*, *supra*, 545 U.S. at p. 170) and because "proceeding to the second step of the *Batson* test puts only a slight burden on the government" (*Collins*, at p. 920). At the second step, the prosecution need only state its actual reasons for striking a minority juror. The prosecutor does not bear any burden to disprove discrimination; "the defendant ultimately carries the 'burden of persuasion' to ' "prove the existence of purposeful discrimination." ' [Citation.] This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.' [Citation.]" (*Johnson v. California*, at pp. 170–171.)

The overriding constitutional interests in eradicating racial discrimination in jury selection and ensuring public confidence in our justice system (*Johnson v.*

*California*, *supra*, 545 U.S. at pp. 171–172; *Powers*, *supra*, 499 U.S. at pp. 411–414; *Batson*, *supra*, 476 U.S. at pp. 87–88), together with the comparatively low cost of requiring a party to state its actual reasons for striking a minority prospective juror, have led some states to essentially eliminate *Batson*'s first step. (See, e.g., *State v. Rayfield* (S.C. 2006) 631 S.E.2d 244, 247; *Melbourne v. State* (Fla. 1996) 679 So.2d 759, 764; *State v. Parker* (Mo. 1992) 836 S.W.2d 930, 940; *State v. Holloway* (Conn. 1989) 553 A.2d 166, 171–172.) This court obviously has not adopted that approach, and I do not urge us to do so. But we have recognized that "it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out." (*Bonilla*, *supra*, 41 Cal.4th at p. 343, fn. 13.) In essence, we have counseled against a "don't ask, don't tell" approach to the *Batson* inquiry because requiring a party to state its reasons "may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established." (*Ibid.*; see *Hartsch*, *supra*, 49 Cal.4th at p. 490, fn. 17.)

The present case illustrates the problems with our doctrine. Despite the racial overtones of this case, it is entirely possible that the prosecutor struck the two black prospective jurors for legitimate, race-neutral reasons. But because the trial court did not require the prosecutor to state his reasons, we can only speculate as to what his actual reasons were. Such speculation — especially with, but even without, comparative juror analysis — cannot dislodge the reasonable inference of discrimination arising from the circumstances here. To cut short the analysis of defendant's *Batson* claim, as today's opinion does, subverts the established framework for ferreting out unlawful discrimination in the exercise of peremptory strikes.

31

**IV.**

The confluence of today's opinion and another questionable decision filed earlier this term (see *Williams*, *supra*, 56 Cal.4th 630) prompts a few broader observations about the state of our *Batson* jurisprudence.

Whether intended or not, our approach at *Batson*'s first step gives rise to a tacit understanding that if the prosecution does not state its reasons for striking a minority prospective juror, either because the trial court did not ask or because the trial court asked but did not require an answer, a reviewing court will stand ready to fill in the blank with speculation and presumptions. This mode of judicial rationalization parallels our approach at *Batson*'s third step in the not-infrequent situation where a trial court simply denies the motion with no explicit findings or analysis. In such cases, our precedent holds that deference to the trial court's ruling is required so long as "the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible." (*People v. Reynoso* (2003) 31 Cal.4th 903, 929 (*Reynoso*); see *Williams*, *supra*, 56 Cal.4th at p. 653.) As I have discussed in *Williams* (see *Williams*, at pp. 700, 709–713 (dis. opn. of Liu, J.)) and in another case filed today (see *Mai*, *supra*, __ Cal.4th at p. __ [pp. 2–13] (conc. opn. of Liu, J.)), this rule, which conflicts with ample state and federal authority, permits and indeed compels appellate courts to rationalize a trial court's silence, with the result that a *Batson* claim may be rejected even when there is no affirmative indication that any court, trial or appellate, has carefully evaluated "all of the circumstances that bear upon the issue" of purposeful discrimination. (*Snyder*, *supra*, 552 U.S. at p. 478; see *Miller-El*, *supra*, 545 U.S. at p. 239; *Batson*, *supra*, 476 U.S. at p. 96.) The tacit understanding is that if a trial court denies a *Batson* claim with no findings or analysis showing that it conducted a proper third-stage *Batson* inquiry, a reviewing court will again stand ready to fill in the blank with speculation and presumptions. Just as our *Batson* step one

32

doctrine tends to encourage (or at least does not discourage) a "don't ask, don't tell" policy between trial courts and prosecutors, our rule of unwarranted deference at *Batson*'s third step effectively amounts to a "don't ask, don't tell" policy between reviewing courts and trial courts. (See *Mai*, at p. __ [p. 25] (conc. opn. of Liu, J.).)

The practical consequence of our approach is readily apparent. Over the past two decades, this court has encountered *Batson* claims in a total of 102 cases. (See appendix, *post*, at pp. 42–44.) Among those 102 cases, this court found only a single instance of *Batson* error — and that was over 12 years ago in a case where the prosecutor, believing that the jury in the first trial had " 'hung . . . on racial grounds,' " struck all five Hispanic members of the venire and all but announced his desire not to have any Hispanic person serve on the second jury. (*Silva*, *supra*, 25 Cal.4th at p. 375, italics omitted.) It is true that for much of the past 20 years, we applied standards that were less protective than those eventually set forth by the United States Supreme Court in *Johnson v. California* and *Miller-El*, which were jointly released in June 2005. Nevertheless, 59 of our 102 decisions involving *Batson* issues over the past two decades were filed after *Johnson v. California* and *Miller-El*, and not a single one of those decisions found a *Batson* error.

Even assuming, realistically, that most *Batson* claims raised in our court are fairly insubstantial, it is not difficult to identify cases that have presented closer questions. (See, e.g., *Williams*, *supra*, 56 Cal.4th at pp. 649–663 [prosecutor struck first five black women in jury box and, in each instance, vaguely stated that challenged juror would hesitate to impose death penalty; trial judge had stopped taking notes and could not independently assess prosecutor's reasons for striking at least two black women; principal defense witness was a black woman]; *People v. Thomas* (2012) 53 Cal.4th 771, 795 ["no obvious reason . . . why the prosecutor

would have chosen to strike" two black prospective jurors]; *Clark*, *supra*, 52 Cal.4th at pp. 904–908 [prosecutor struck four of five black prospective jurors; hypothesized reasons at *Batson* step one were not subject to comparative juror analysis]; *Hartsch*, *supra*, 49 Cal.4th at pp. 488–489 & fn. 16 [no apparent reason for strike of a qualified black prospective juror who supported the death penalty]; *People v. Mills* (2010) 48 Cal.4th 158, 176–181 ["the prosecutor challenged all six African-Americans who were at one time or another seated in the box"; prosecutor struck one black prospective juror because of her views on death penalty, despite minor differences with views of nonblack jurors who were not struck]; *Hoyos*, *supra*, 41 Cal.4th at pp. 902–903 [prosecutor struck all three Hispanic female prospective jurors; hypothesized reasons at *Batson* step one were not subject to comparative juror analysis].) It is no doubt true that "[j]ury selection is, and should be, a highly individualized process" (*People v. Williams*, *supra*, 40 Cal.4th at p. 340 (conc. opn. of Corrigan, J.)), and there are many "subtle nuances" that "are seldom captured by the written record" (*id.* at p. 339). But even allowing for the fact-specific judgments inherent in each case and the "great many legitimate factors that an advocate may properly consider in the exercise of peremptory challenges" (*ibid.*), the nearly absolute uniformity of results produced by this court's *Batson* jurisprudence is striking.

By contrast, a number of federal courts of appeals, attentive to the proper application of *Batson*'s three-step framework, have repeatedly declined to affirm erroneous or inadequate *Batson* rulings in the years since *Johnson v. California* and *Miller-El*. (See, e.g., *Price v. Cain* (5th Cir. 2009) 560 F.3d 284, 287; *Reed v. Quarterman* (5th Cir. 2009) 555 F.3d 364, 382 (*Reed*); *United States v. Williamson* (5th Cir. 2008) 533 F.3d 269, 277; *Harris v. Hardy* (7th Cir. 2012) 680 F.3d 942, 965–966; *United States v. Rutledge* (7th Cir. 2011) 648 F.3d 555, 560; *United States v. Taylor* (7th Cir. 2011) 636 F.3d 901, 906 (*Taylor*); *United*

*States v. McMath* (7th Cir. 2009) 559 F.3d 657, 665–666; *United States v. Stephens* (7th Cir. 2005) 421 F.3d 503, 518; *Ali v. Hickman* (9th Cir. 2009) 584 F.3d 1174, 1196; *Paulino v. Harrison* (9th Cir. 2008) 542 F.3d 692, 703; *Green v. LaMarque* (9th Cir. 2008) 532 F.3d 1028, 1033; *Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 371 (en banc); *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1108–1109; *Adkins v. Warden* (11th Cir. 2013) 710 F.3d 1241, 1258 (*Adkins*); *Madison v. Commissioner* (11th Cir. 2012) 677 F.3d 1333, 1339; *McGahee v. Alabama Dept. of Corrections* (11th Cir. 2009) 560 F.3d 1252, 1267.) This body of authority provides an additional reason for skepticism as to whether our court has maintained the proper level of vigilance.

Our track record is even more remarkable when considered in light of what we have learned over the same period about the prevalence and persistence of racial disparities in the exercise of peremptory strikes as well as the mechanisms of conscious and unconscious bias that fuel those disparities, especially when it comes to black jurors and black defendants. In a recent study of how prosecutors exercised peremptory challenges in capital trials of all North Carolina inmates on death row as of July 1, 2010 — a total of 173 proceedings involving 7,421 strikes — the authors found that "[o]ver the twenty-year period we examined, prosecutors struck eligible black venire members at about 2.5 times the rate they struck eligible venire members who were not black. These disparities remained consistent over time and across the state, and did not diminish when we controlled for information about venire members that potentially bore on the decision to strike them," including views on the death penalty, prior experience with crime, employment status, and whether the jury knew any participant in the trial. (Grosso & O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-*Batson *North Carolina Capital Trials* (2012) 97 Iowa L.Rev. 1531, 1533–1534, 1542–1543, 1551 (Grosso & O'Brien).) Further, the

study found that "although state strike rates are always higher against black venire members than against other venire members, the disparity is significantly greater in cases with black defendants." (*Id.* at p. 1550; see *id.* at p. 1549 ["In cases with non-black defendants, the average strike rate was 51.4% against black venire members and 26.8% against all other venire members. In cases with black defendants, the average strike rate was 60.0% against black venire members and 23.1% against other venire members." (fns. omitted)].)

The North Carolina study explained that "[n]one of the factors we controlled for in the regression analysis eliminated the effect of race in jury selection. While we found many non-racial factors that were highly relevant to the decision to strike, none was so closely associated with race or so frequent that it could serve as an alternative explanation of the racial disparities. . . . A black venire member was still more than twice as likely (2.48 to 1) to be struck by the state even when other relevant characteristics were held constant." (Grosso & O'Brien, *supra*, 97 Iowa L.Rev. at p. 1554.) The authors acknowledged that "we cannot account for a venire member's physical appearance or body language — factors litigators often cite as relevant to their decision to strike." (*Id.* at p. 1555.) "But factors like these should generally be unrelated to the race of the venire member. Moreover, even if these factors were associated more with some racial groups than others, that association would have to be very strong and the factor quite frequent to explain the observed racial disparities." (*Ibid.*)

A study of 317 capital trials in Philadelphia between 1981 and 1997 reported similar findings. (Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis* (2001) 3 U.Pa. J. Const. L. 3.) On average, prosecutors struck 51 percent of the black jurors, but only 26 percent of comparable nonblack jurors, whom they had the opportunity to strike. (*Id.* at p. 58, table 4, col. B.) In cases involving a black defendant and a nonblack

36

victim, the disparity was even greater (57 percent versus 24 percent). (*Id.* at p. 58, table 4, col. C.) The role of race in jury selection remained significant even when nonracial juror characteristics such as age, occupation, education, and answers to voir dire questions were taken into account. (*Id.* at pp. 68–72, 122.)

Applying the methodology of the Philadelphia study, The Dallas Morning News examined peremptory strikes in 108 noncapital felony trials in Dallas during the first 10 months of 2002. (McGonigle et al., *A Process of Juror Elimination: Dallas Prosecutors Say They Don't Discriminate, but Analysis Shows They Are More Likely to Reject Black Jurors* (Aug. 21, 2005) The Dallas Morning News, p. 1A [2005 WLNR 24658335].) Using regression analysis to control for age, education, occupation, socioeconomic status, and answers to voir dire questions, the study found that "[p]rosecutors excluded eligible blacks from juries at more than twice the rate they rejected eligible whites . . . . In fact, being black was the most important personal trait affecting which jurors prosecutors rejected . . . . Jurors' attitudes toward criminal justice issues also played an important role, but even when blacks and whites answered key questions the same way, blacks were rejected at higher rates." (*Ibid.*; see *How the Analysis Was Done* (Aug. 21, 2005) The Dallas Morning News, p. 19A [2005 WLNR 24657224].)

The findings above are consistent with other studies of actual trials. (See Bourke et al., Black Strikes: A Study of the Racially Disparate Use of Peremptory Challenges by the Jefferson Parish District Attorney's Office (2003); Rose, *The Peremptory Challenge Accused of Race or Gender Discrimination? Some Data from One County* (1999) 23 Law & Hum. Behav. 695; Turner et al., *Race and Peremptory Challenges During Voir Dire: Do Prosecution and Defense Agree?* (1986) 14 J. Crim.Just. 61.) They are also consistent with experimental research showing that study participants assigned to the role of a prosecutor are much more likely to strike black jurors than comparable nonblack jurors. In one study,

37

researchers told participants they had a single peremptory strike left to use on one of two jurors with characteristics potentially unattractive to a prosecutor: "Juror #1" was a 43-year-old married male "journalist who, several years earlier, had written articles about police misconduct," and "Juror #2" was a 40-year-old divorced male "advertising executive with little scientific background who stated during *voir dire* that he was skeptical of statistics because they are easily manipulated." (Sommers & Norton, *Race-based Judgments, Race-neutral Justifications: Experimental Examination of Peremptory Use and the* Batson *Challenge Procedure* (2007) 31 Law & Hum. Behav. 261, 265.) Participants were randomly assigned to one of two conditions: either Juror #1 was depicted as black and Juror #2 as white, or vice versa. (*Id.* at p. 266.) The study found that as to Juror #1, participants struck him 77 percent of the time when he was black compared to 53 percent of the time when he was white, and as to Juror #2, participants struck him 47 percent of the time when he was black compared to 23 percent of the time when he was white. (*Id.* at p. 267.) Interestingly, when asked why they struck a particular juror, the study participants rarely mentioned race; virtually all participants "cited as their most important justification either Juror #1's familiarity with police misconduct or Juror #2's skepticism about statistics." (*Id.* at pp. 267–268; see also Hayden et al., *Prosecutorial Discretion in Peremptory Challenges: An Empirical Investigation of Information Use in the Massachusetts Jury Selection Process* (1978) 13 New Eng. L.Rev. 768, 784–785, 787–788 [jury selection simulation study involving 20 randomly selected prosecutors found that participants were more likely to ask about prospective juror's race when defendant was black than when defendant was white, and that "a prosecutor would be very reluctant to remove a white juror by peremptory challenge where a black defendant is involved, without first making completely sure that there is solid justification for his removal"]; see generally Sommers &

Norton, *Race and Jury Selection:  Psychological Perspectives on the Peremptory Challenge Debate* (2008) 63 Amer. Psychologist 527.)

Of course, every case is different, and there are circumstances and nuances that these studies cannot fully address.  A court cannot adjudicate broad patterns; we can only decide one case at a time.  But patterns are comprised of individual cases decided in accordance with legal principles, and when those principles produce uniformity of results to the degree we have seen in our *Batson* jurisprudence, one has to wonder whether it can really be true that the exercise of peremptory strikes in the cases that come before our court differs so radically from the robust and consistent patterns observed elsewhere.

Like my colleagues, I am confident that our trial courts take seriously their responsibility to combat unlawful discrimination in jury selection.  But where, as here, it is not clear that a trial court has applied the correct standard at *Batson*'s first step, there is no dispute that a reviewing court must independently examine the record and apply the correct standard.  (Maj. opn., *ante*, at pp. 34–35.)  At *Batson*'s third step, our trial courts are best positioned to assess the credibility of a prosecutor's stated reasons because they are "experienced in supervising *voir dire*" (*Batson*, *supra*, 476 U.S. at p. 97) and because they " ' "have first-hand knowledge and observation of critical events" ' " in the courtroom (*Lenix*, *supra*, 44 Cal.4th at p. 626).  But jury selection can be a lengthy and complex process, and in the context of a particular strike, a trial court may have "stopped taking notes" (*Williams*, *supra*, 56 Cal.4th at p. 651), it may have neglected to consult the record of voir dire (*id.* at p. 716 (dis. opn. of Liu, J.)), it "may not have recalled [a juror's] demeanor" (*Snyder*, *supra*, 552 U.S. at p. 479), it may have declined to engage in comparative juror analysis despite the urging of counsel (*Mai*, *supra*, __ Cal.4th at p. __ [p. 79]), it may have applied an erroneous legal standard (*Reynoso*, *supra*, 31 Cal.4th at pp. 933–934 (dis. opn. of Kennard, J.); *Taylor*, *supra*, 636 F.3d at

39

pp. 905–906), or it may have made an unreasonable judgment under the totality of circumstances (*Miller-El*, *supra*, 545 U.S. at p. 266; *Adkins*, *supra*, 710 F.3d at p. 1255; *Reed*, *supra*, 555 F.3d at p. 382). Because it is the responsibility of appellate courts to be alert to these occasional lapses, it seems fair to ask whether our virtually uniform pattern of affirmances across 102 cases over the past 20 years demonstrates meaningful appellate review of *Batson* claims in accordance with proper legal standards.

When one examines the legal underpinnings of our *Batson* decisions, it is not difficult to understand why this court has almost never found unlawful discrimination in jury selection. Reflexive application of deference where there is nothing in the record to defer to, judicial speculation as to the reasons for a strike where the prosecutor has offered none, and unduly limited and grudging application of comparative juror analysis combine to erect a virtually impossible hurdle for *Batson* claims to surmount. As appellate judges, we are familiar with these lawyerly modes of rationalization and the predictable consequences of their repeated application. But a jurisprudence of speculation and presumptions does not serve the goal of producing "actual answers to suspicions and inferences that discrimination may have infected the jury selection process." (*Johnson v. California*, *supra*, 545 U.S. at p. 172.) Nor does it adequately protect "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." (*Batson*, *supra*, 476 U.S. at pp. 85–86.) Most importantly, a jurisprudence of speculation and presumptions — and the stark results it has wrought — cannot inspire in all of our citizens, of whatever race or background, a full and equal measure of "confidence in the fairness of our system of justice." (*Id.* at p. 87.)

In sum, our *Batson* jurisprudence falls short of the vigilance required by the constitutional guarantee of equal protection of the laws. Nevertheless, under

40

compulsion of this court's precedent, I concur in the denial of defendant's *Batson* claim and, in all other respects, join the opinion of the court.

LIU, J.

**APPENDIX TO CONCURRING OPINION OF LIU, J.**

*Batson* claims decided by the California Supreme Court, 1993–2013

1.  *People v. Jones* (2013) __ Cal.4th __, __–__ [pp. 12–18]
2.  *People v. Mai* (2013) __ Cal.4th __, __–__ [pp. 77–89]
3.  *People v. Harris* (2013) __ Cal.4th __, __–__ [pp. 32–41]
4.  *People v. Edwards* (2013) __ Cal.4th __, __–__ [pp. 40–43]
5.  *People v. DeHoyos* (2013) 57 Cal.4th 79, 101–116
6.  *People v. Lopez* (2013) 56 Cal.4th 1028, 1192–1194
7.  *People v. Williams* (2013) 56 Cal.4th 630, 649–663
8.  *People v. Pearson* (2013) 56 Cal.4th 393, 420–423
9.  *People v. McKinzie* (2012) 54 Cal.4th 1302, 1310–1322
10. *People v. Riccardi* (2012) 54 Cal.4th 758, 783–797
11. *People v. Streeter* (2012) 54 Cal.4th 205, 220–226
12. *People v. Thomas* (2012) 53 Cal.4th 771, 795–796
13. *People v. Elliott* (2012) 53 Cal.4th 535, 559–574
14. *People v. Dement* (2011) 53 Cal.4th 1, 18–21
15. *People v. Clark* (2011) 52 Cal.4th 856, 903–908
16. *People v. Blacksher* (2011) 52 Cal.4th 769, 800–803
17. *People v. Garcia* (2011) 52 Cal.4th 706, 746–750
18. *People v. Vines*  (2011) 51 Cal.4th 830, 847–854
19. *People v. Thomas* (2011) 51 Cal.4th 449, 471–475
20. *People v. Jones* (2011) 51 Cal.4th 346, 356–369
21. *People v. Booker*  (2011) 51 Cal.4th 141, 161–169
22. *People v. Cowan* (2010) 50 Cal.4th 401, 445–451
23. *People v. Lomax* (2010) 49 Cal.4th 530, 569–578
24. *People v. Hartsch* (2010) 49 Cal.4th 472, 485–490
25. *People v. Thompson* (2010) 49 Cal.4th 79, 105–109
26. *People v. Taylor* (2010) 48 Cal.4th 574, 611–617, 640–644
27. *People v. Mills* (2010) 48 Cal.4th 158, 173–185
28. *People v. Taylor* (2009) 47 Cal.4th 850, 885–896
29. *People v. Davis* (2009) 46 Cal.4th 539, 582–584
30. *People v. Hawthorne* (2009) 46 Cal.4th 67, 77–84
31. *People v. Hamilton* (2009) 45 Cal.4th 863, 897–909
32. *People v. Carasi* (2008) 44 Cal.4th 1263, 1291–1295

33.  *People v. Cruz* (2008) 44 Cal.4th 636, 654–661

34.  *People v. Lenix* (2008) 44 Cal.4th 602, 611–631

35.  *People v. Salcido* (2008) 44 Cal.4th 93, 135–144

36.  *People v. Watson* (2008) 43 Cal.4th 652, 671–682

37.  *People v. Lewis* (2008) 43 Cal.4th 415, 468–482

38.  *People v. Howard* (2008) 42 Cal.4th 1000, 1016–1020

39.  *People v. Kelly* (2007) 42 Cal.4th 763, 778–781

40.  *People v. Zambrano* (2007) 41 Cal.4th 1082, 1101–1117

41.  *People v. Hoyos* (2007) 41 Cal.4th 872, 899–903

42.  *People v. Thornton* (2007) 41 Cal.4th 391, 461–463

43.  *People v. Bonilla* (2007) 41 Cal.4th 313, 340–350

44.  *People v. Stevens* (2007) 41 Cal.4th 182, 192–198

45.  *People v. Lancaster* (2007) 41 Cal.4th 50, 73–78

46.  *People v. Bell* (2007) 40 Cal.4th 582, 594–601

47.  *People v. Williams* (2006) 40 Cal.4th 287, 312–313

48.  *People v. Lewis* (2006) 39 Cal.4th 970, 1008–1024

49.  *People v. Stanley* (2006) 39 Cal.4th 913, 934–945

50.  *People v. Ledesma* (2006) 39 Cal.4th 641, 677–680

51.  *People v. Johnson* (2006) 38 Cal.4th 1096, 1098–1104

52.  *In re Freeman* (2006) 38 Cal.4th 630, 643–645

53.  *People v. Avila* (2006) 38 Cal.4th 491, 540–558

54.  *People v. Huggins* (2006) 38 Cal.4th 175, 226–236

55.  *People v. Jurado* (2006) 38 Cal.4th 72, 102–108

56.  *People v. Schmeck* (2005) 37 Cal.4th 240, 265–275

57.  *People v. Gray* (2005) 37 Cal.4th 168, 183–192

58.  *People v. Cornwell* (2005) 37 Cal.4th 50, 66–74

59.  *People v. Ward* (2005) 36 Cal.4th 186, 199–205

60.  *People v. Roldan* (2005) 35 Cal.4th 646, 701–703

61.  *People v. Panah* (2005) 35 Cal.4th 395, 438–442

62.  *People v. Smith* (2005) 35 Cal.4th 334, 346–349

63.  *People v. Young* (2005) 34 Cal.4th 1149, 1170–1174

64.  *People v. Morrison* (2004) 34 Cal.4th 698, 709–710

65.  *People v. Haley* (2004) 34 Cal.4th 283, 304–308

66.  *People v. Griffin* (2004) 33 Cal.4th 536, 552–557

67.  *People v. Cleveland* (2004) 32 Cal.4th 704, 730–734

68.  *People v. Heard* (2003) 31 Cal.4th 946, 969– 971

69. *People v. Reynoso* (2003) 31 Cal.4th 903, 907–929

70. *People v. Yeoman* (2003) 31 Cal.4th 93, 115–119

71. *People v. Johnson* (2003) 30 Cal.4th 1310–1325

72. *People v. Jones* (2003) 30 Cal.4th 1084, 1102–1105

73. *People v. Boyette* (2002) 29 Cal.4th 381, 419–423

74. *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1121–1126

75. *People v. McDermott* (2002) 28 Cal.4th 946, 966–981

76. *People v. Cash* (2002) 28 Cal.4th 703, 723–726

77. *People v. Farnam* (2002) 28 Cal.4th 107, 134–139

78. *People v. Catlin* (2001) 26 Cal.4th 81, 115–119

79. *People v. Anderson* (2001) 25 Cal.4th 543, 568–570

80. *People v. Silva* (2001) 25 Cal.4th 345, 376–387

81. *People v. Ayala* (2000) 24 Cal.4th 243, 264–269

82. *People v. Box* (2000) 23 Cal.4th 1153, 1185–1192

83. *People v. Jenkins* (2000) 22 Cal.4th 900, 992–995

84. *People v. Ervin* (2000) 22 Cal.4th 48, 74–77

85. *People v. Hayes* (1999) 21 Cal.4th 1211, 1283–1284

86. *People v. Welch* (1999) 20 Cal.4th 701, 745–746

87. *People v. Bolin* (1998) 18 Cal.4th 297, 316–317

88. *People v. Jones* (1998) 17 Cal.4th 279, 293–295

89. *People v. Williams* (1997) 16 Cal.4th 635, 663–668

90. *People v. Jones* (1997) 15 Cal.4th 119, 159–163

91. *People v. Mayfield* (1997) 14 Cal.4th 668, 726–727

92. *People v. Alvarez* (1996) 14 Cal.4th 155, 192–199

93. *People v. Jackson* (1996) 13 Cal.4th 1164, 1195–1198

94. *People v. Arias* (1996) 13 Cal.4th 92, 134–140

95. *People v. Davenport* (1995) 11 Cal.4th 1171, 1199–1203

96. *People v. Crittenden* (1994) 9 Cal.4th 83, 114–120

97. *People v. Turner* (1994) 8 Cal.4th 137, 164–172

98. *People v. Fudge* (1994) 7 Cal.4th 1075, 1095–1098

99. *People v. Montiel* (1993) 5 Cal.4th 877, 907–911

100. *People v. Sims* (1993) 5 Cal.4th 405, 427–432

101. *People v. Garceau* (1993) 6 Cal.4th 140, 170–173

102. *People v. Cummings* (1993) 4 Cal.4th 1233, 1281–1283

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Harris

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S081700
**Date Filed:** August 26, 2013

_____

**Court:** Superior
**County:** Kern
**Judge:** Roger D. Randall

_____

**Counsel:**

Richard I. Targow, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Harry Joseph Colombo, William K. Kim, Eric Christoffersen, Kathleen A. McKenna and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard I. Targow
Post Office Box 1143
Sebastopol, CA 95473
(707) 829-5190

Amanda D. Cary
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
(559) 477-1682